[No. G037424. Fourth Dist., Div. Three. June 20, 2008.]

CYNTHIA D. TALBOTT, as Trustee, etc., Plaintiff and Respondent, v. WILLIAM HUSTWIT et al., Defendants and Appellants.

COUNSEL

William A. Hustwit for Defendants and Appellants.

Beauchamp & Associates and Robert Beauchamp for Plaintiff and Respondent.

OPINION

ARONSON, J.—Defendants William and Janyce Hustwit challenge a judgment entered against them on a guaranty agreement after the lender foreclosed on real property securing a loan made to the Hustwits' trust. The Hustwits contend the trial court erred in refusing to apply Code of Civil Procedure section 580a,[1] which requires an appraisal of the real property security before the court may issue a deficiency judgment. The Hustwits assert that the general policy against excess recovery by creditors following the foreclosure of real property requires applying section 580a to guarantors as well as principal debtors. Alternatively, the Hustwits argue they were not true guarantors because they were closely related to the debtor as settlors and beneficiaries of the trust.

We conclude the trial court did not err. Case law uniformly holds that section 580a does not apply to guarantors. Moreover, the Hustwits structured the trust to separate themselves from the trust's debts. They are therefore not principal obligors to the loan, but true guarantors. Accordingly, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

The Hustwits are guarantors of a loan plaintiff Cynthia D. Talbott, trustee of the Cynthia D. Talbott Separate Property Trust (Talbott), made to Pacific West Investment Trust (Trust). A trust deed against certain Newport Beach real property secured the Trust's loan obligations. The Trust defaulted and Talbott instituted a nonjudicial foreclosure under the power of sale provision in the trust deed. A trustee sale was held in March 2005. Talbott purchased the property with a $900,000 credit bid, subject to a senior loan. Talbott then sued the Hustwits under their guaranty agreements for the difference between the $900,000 credit bid and the unpaid balance of the loan, $1,288,042.36, plus interest. After a bench trial on stipulated facts, the court issued a written statement of decision awarding Talbott $432,628.40, plus interest. The Hustwits now appeal.

---

[1] All statutory references are to the Code of Civil Procedure, unless other noted.

II

DISCUSSION

A.  *Section 580a Does Not Apply to Guarantors*

■  California's antideficiency statutes (§§ 580a, 580b, 580d, 726), en-
acted during the Depression, limit or prohibit lenders from obtaining personal
judgments against borrowers where the lender's sale of real property security
produces proceeds insufficient to cover the amount of the debt. (See
*Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 600–602 [125 Cal.Rptr. 557,
542 P.2d 981].) Section 580a provides in relevant part: "Whenever a money
judgment is sought for the balance due upon an obligation for the payment of
which a deed of trust or mortgage with power of sale upon real property or
any interest therein was given as security, following the exercise of the power
of sale in such deed of trust or mortgage, the plaintiff shall set forth in his or
her complaint the entire amount of the indebtedness which was secured by
the deed of trust or mortgage at the time of sale, the amount for which the
real property or interest therein was sold and the fair market value thereof at
the date of sale and the date of that sale. . . . Before rendering any judgment
the court shall find the fair market value of the real property, or interest
therein sold, at the time of sale. The court may render judgment for not more
than the amount by which the entire amount of the indebtedness due at the
time of sale exceeded the fair market value of the real property or interest
therein sold at the time of sale with interest thereon from the date of the
sale . . . ."

The Hustwits contend section 580a applied to them, and the trial court
erred in failing to consider evidence that the property's fair market value
exceeded the total amount owed Talbott. We disagree.

■  The Hustwits were held liable as guarantors of the Trust's loan
obligation to Talbott. A guarantor is one who promises to answer for the debt
or perform the obligation of another when the person ultimately liable fails to
pay or perform. (Civ. Code, § 2787.) "A contract of guaranty gives rise to a
separate and independent obligation from that which binds the principal
debtor." (*Security-First Nat. Bank v. Chapman* (1940) 41 Cal.App.2d 219, 221
[106 P.2d 431].) "Since section 580a has to do solely with actions for
recovery of deficiency judgments on the principal obligation [it] has no
application to an action against a guarantor [citations] . . . ." (*Mariners Sav. &
Loan Assn. v. Neil* (1971) 22 Cal.App.3d 232, 234 [99 Cal.Rptr. 238]
(*Mariners*); see *Bank of America etc. Assn. v. Hunter* (1937) 8 Cal.2d 592
[67 P.2d 99]; *Loeb v. Christie* (1936) 6 Cal.2d 416 [57 P.2d 1303]; see also
*Dreyfuss v. Union Bank of California* (2000) 24 Cal.4th 400, 407 [101

Cal.Rptr.2d 29, 11 P.3d 383] ["a creditor's resort to any and all security on a debt does not implicate the antideficiency provisions"].)

■ The Hustwits do not address the case law holding that guarantors cannot claim the protection of section 580a, and concede they were unable to discover any case law to the contrary. Instead, they cite two cases that recognize a general state policy to prevent secured creditors from obtaining excess recoveries. (See *Bank of Hemet v. United States* (9th Cir. 1981) 643 F.2d 661; *Walter E. Heller Western, Inc. v. Bloxham* (1985) 176 Cal.App.3d 266 [221 Cal.Rptr. 425].) Neither of these cases concerns guarantors, and the general policy statements contained in them does not persuade us to abandon Supreme Court precedent.[2] Accordingly, we conclude section 580a has no application to guarantors.

## B. *The Hustwits Are True Guarantors*

■ Although case law is uniform in holding section 580a does not apply to guarantors, the question remains whether the Hustwits were true guarantors. Courts have recognized a distinction between true, independent contracts of guaranty and guaranties executed by the primary obligor. (*Mariners, supra,* 22 Cal.App.3d at p. 234.) "It is well established that where a principal obligor purports to take on additional liability as a guarantor, nothing is added to the primary obligation. [Citations.] The correct inquiry set out by the authority is whether the purported debtor is anything other than an instrumentality used by the individuals who guaranteed the debtor's obligation, and whether such instrumentality actually removed the individuals from their status and obligations as debtors." (*Torrey Pines Bank v. Hoffman* (1991) 231 Cal.App.3d 308, 319–320 [282 Cal.Rptr. 354] (*Torrey Pines*); see *Cadle Co. II v. Harvey* (2000) 83 Cal.App.4th 927, 933 [100 Cal.Rptr.2d 150].)

In *Torrey Pines*, a bank sued a husband and wife on personal guaranties signed in connection with a construction loan the bank made to a revocable living trust in which the defendants were the trustors, trustees, and primary beneficiaries. The court determined the structure of the trust made any distinction between the guarantors and the debtor insignificant, thus barring the bank from recovering on the guaranties. Specifically, the court noted that under the trust law at the time, trustees were personally liable on contracts

---

[2] As the concurrence recognizes, the case law supporting liability here has remained unchanged for over 60 years. We can thus safely assume virtually all of the loan guaranties now in existence were made in reliance upon the current state of the law. Although we share our concurring colleague's observations and concerns, we believe any change in the law affecting liability of guarantors for deficiency judgments should originate with the Legislature, which is better able to measure the impact of altering commercial arrangements by taking into account the views of experts and affected parties.

entered into on behalf of their trusts. Accordingly, the trust was deemed a " 'mere instrumentality.' " (*Torrey Pines, supra*, 231 Cal.App.3d at p. 321.) The court, however, did not enunciate a blanket rule applying to all living trusts, clarifying: "We emphasize that our holding is necessarily limited to these facts. While it would be possible in a living trust to create a greater degree of separation of interest between settlor, trustee, and beneficiary (e.g., by the use of a separate trustee), this particular trust device did not accomplish enough division between these interests to enable us to say that the purpose of the antideficiency law would be served by enforcing these personal guaranties as 'true' guaranties, as opposed to 'purported' guaranties." (*Id.* at p. 323.)

Similarly, *Riddle v. Lushing* (1962) 203 Cal.App.2d 831, 836 [21 Cal.Rptr. 902], involved a situation in which partners had individually guaranteed a partnership note. Because the partners were already jointly and severally liable on the note as general partners, the court held the guaranty did not change the partners' status as principal obligors. (*Ibid.*)

In contrast, *Mariners, supra*, 22 Cal.App.3d 232, involved a situation where the wife took out a loan secured by her separately owned real property, and the husband signed a personal guaranty. The court recognized that in many ways a husband and wife are partners, but nonetheless held the husband became a true guarantor because he would not have been personally liable for the loan made to the wife absent the guaranty. (*Id.* at p. 235.)

■ Here, the trust arrangement provided the Hustwits a significantly greater degree of separation than that in *Torrey Pines*. Although the Hustwits are the settlors of the Trust, they are secondary, not primary, beneficiaries. More importantly, the Hustwits are not trustees of the Trust; instead, the Hustwits used a limited liability company as trustee, thus limiting their personal liability for the Trust's obligations. The Hustwits became true guarantors because the Hustwits' trust arrangement "actually removed the[m] from their status and obligations as debtors." (*Torrey Pines, supra*, 231 Cal.App.3d at p. 320.) Accordingly, we conclude the trial court did not err in holding the protections of section 580a inapplicable in the present case.

III

DISPOSITION

The judgment is affirmed. Talbott is entitled to costs on appeal.

O'Leary, J., concurred.

**SILLS, P. J.,** Concurring.—I agree with the reasoning and result of the majority opinion, because both are compelled by Supreme Court authority. However, I write separately to voice concerns about the potential danger for the easy circumvention of the protections offered consumers under California's statutory antideficiency legislation by the use of loan guarantees. (See Code Civ. Proc., §§ 580a, 580b, 580d, 726.)[1] The current "subprime mortgage crisis" at a time of generally declining real estate prices illustrates the public importance of the issue.[2]

Just three years after the 1933 enactment of antideficiency legislation, the California Supreme Court had occasion to confront the issue of deficiency judgments against guarantors in *Loeb v. Christie* (1936) 6 Cal.2d 416 [57 P.2d 1303] (*Loeb*) in the specific context of whether a statute (Civ. Code, § 2809) that provides that guarantors do not assume any obligation "more burden-some" than that assumed by the principal debtor, would apply to deficiency judgments. The court reasoned that the answer was no, because the principal still "remains liable at all times for the full amount of the obligation and may be compelled to pay it, first out of the security, *and thereafter out of his general assets*." (*Loeb, supra*, 6 Cal.2d at p. 420, italics added.) That is, the *Loeb* rationale was explicitly premised on the law as it existed *prior* to antideficiency legislation, and accordingly the *Loeb* court relied on a number of pre-1933 cases for the abstract proposition that a loan guarantee was an obligation "separate and independent" from that of "the principal debtor." (*Ibid.*) A guarantee is merely "*a* source"—as distinct from *the* source—"from which the obligation of the principal or maker is to be repaid." (*Ibid.*, italics added.)

And indeed, the *Loeb* court did not at all mention the recently enacted antideficiency statutes (the guarantee was executed in 1930). The idea that a

---

[1] As explained by the California Supreme Court in *Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 600 [125 Cal.Rptr. 557, 542 P.2d 981], antideficiency was a Depression-era response to the potential for "double recovery" by lenders. At a time of declining property prices, lenders would be able to purchase the real property securing the debt at a price below normal market value, and then hold the debtor liable "for a large deficiency." (*Ibid.*) Later, the incentive on the part of the lender to bid too low was removed by creating a right of redemption (bid too low and the debtor could get the property back for that amount!) and the right of redemption was extended to both private and judicial foreclosures. The point being: If a lender wanted a deficiency judgment, the lender would be subject to statutory redemption rights. (*Id.* at pp. 601–602.)

[2] See Becker, *The Subprime Housing Crisis* (Dec. 23, 2007) The Becker-Posner Blog <http://www.becker-posner-blog.com/archives/2007/12/the_subprime_ho.html> (as of June 20, 2008) ("The vast majority of economists, including me, were surprised by the extent of the subprime mortgage crisis. This needs to be recognized when evaluating the numerous proposals about how to prevent the next housing crisis, and also about how to help those who are in danger of having their homes foreclosed.").

guarantor might have, in the wake of those statutes, a substantively "more burdensome" obligation than that assumed by the principal debtor was not addressed.

It was not until about a year later, in *Bank of America etc. Assn. v. Hunter* (1937) 8 Cal.2d 592 [67 P.2d 99] (*Hunter*), that the Supreme Court confronted the 1933 antideficiency legislation. The irony is that the court practically backed into the issue of whether antideficiency legislation properly covers guarantors accidentally, and only then as a minor premise taken for granted in addressing *another* issue.

*Hunter* was a statute of limitations case. The central question was whether a 1933 amendment to the four-year statute of limitations in section 337 of the Code of Civil Procedure, which provided for a three-month limitation after a foreclosure sale, could apply to a guarantor. (See *Hunter, supra*, 8 Cal.2d at p. 597.) The court did not even mention the 1933 antideficiency legislation until relatively late into the opinion (see *Hunter, supra*, 8 Cal.2d at pp. 597–598). On those pages the court set up this syllogism in order to demonstrate that the four-year statute of limitations did not apply to guarantors: First, the court stated that the antideficiency legislation of 1933 (specifically § 580a of the Code Civ. Proc.) was added in the same session of the Legislature that added the three-month statute of limitations from foreclosures. Then the court, rather casually as if the issue had not been briefed, stated that a "reading" of the 1933 antideficiency legislation "discloses that its provisions have to do solely with actions for recovery of deficiency judgments on the principal obligation after sale under trust deed or mortgage, as distinguished from a guarantor's obligation such as is here involved." (8 Cal.2d at p. 598.) The court then quoted a swath of text from section 580a, which contained its own three-month statute of limitations from foreclosure. (8 Cal.2d at p. 598.) The court then noted the necessity of a parallel limitation in the more general Code of Civil Procedure section 337 in order to "assure consistency between the two sections." (8 Cal.2d at p. 598.) From that, the court's "opinion" was that the three-month limitation in section 377 was "intended to, and does, prescribe the time within which an action for a deficiency judgment must be commenced," and therefore would have "no application to an action of this character based on the independent obligation of a guarantor." (8 Cal.2d at p. 598.)

In short, the *Hunter* court went into a statute of limitations case assuming, as a premise taken for granted, that it was already clear that antideficiency legislation did not cover the "independent" obligation of a guarantor. The court came to that conclusion without ever having confronted the issue head on. And I should also point out that the *Hunter* court, unlike the *Loeb* court, did not confront at all the impact of Civil Code section 2809.

The next development was the change of Civil Code section 2809 to abolish any distinction between guarantors and sureties. (The pre-1939 version of the statute is quoted in *Loeb*, and used the phrase "obligation of a guarantor" where the statute now uses the phrase "obligation of a surety.") (See *Loeb, supra,* 6 Cal.2d at p. 419.)

The decisive moment came three years later, about a year into World War II, in *Everts v. Matteson* (1942) 21 Cal.2d 437 [132 P.2d 476] (*Everts*). *Everts,* like the present case, involved an action on a guarantee.

To understand *Everts,* though, one should begin by parsing Civil Code section 2809, and in particular the statute's use of the words "must be neither larger in amount *nor in other respects* more burdensome than that of the principal." (Italics added.) The phrase "nor in other respects" proves that the guarantor's merely being on the hook for the *amount* of the debt is not the end of a court's inquiry: Besides "amount," the guarantor may not be "in other respects" more burdened than the principal debtor. A logical, natural, and plain reading of the text of section 2809 would thus indicate that if the principal debtor is afforded certain protections against having to pay the entire "amount" of the debt, *not* to afford those same protections to a guarantor would indeed be to impose "more burdensome" obligations on the guarantor. And, as the present case shows, that's only common sense anyway: If a homeowner need not fear the prospect of a deficiency judgment, and if a guarantor of the homeowner's loan undertakes no more "burdensome" obligations than that undertaken by the homeowner, the guarantor should not have to fear a deficiency judgment either.

And for a brief flicker of a moment, the Supreme Court recognized this intuitive and commonsense reading of Civil Code section 2809 in *Everts*. The entire passage containing that flicker is quoted in the margin.[3] The key phrase is that "to require the guarantor to pay a larger amount would *seem to violate* the statutory mandate that his obligation must be neither larger in amount nor in other respects more burdensome than that of the principal." (*Everts, supra,* 21 Cal.2d at p. 445, italics added.)

Alas, the passage recalls Churchill's comment about Stanley Baldwin, who would occasionally stumble over the truth, but manage to pick himself up and

---

[3] "A logical distinction may be made between the cases where the creditor proceeded against the guarantor before subjecting the trust deed security to the payment of the primary obligation and one where, as in the present action, the creditor has sold the security and applied the proceeds in payment of the primary obligation before suing the guarantor. In the latter situation, since the amount for which judgment may be entered against the principal debtor is fixed by section 580a of the Code of Civil Procedure, to require the guarantor to pay a larger amount would seem to violate the statutory mandate that his obligation must be neither larger in amount nor in other respects more burdensome than that of the principal. (Civ. Code, § 2809.)" (*Everts, supra,* 21 Cal.3d at p. 445.)

go on as if nothing had happened. While the *Everts* court had recognized the statutory inconsistency of not giving guarantors the same antideficiency protection otherwise afforded principal debtors, it just could not bring itself to declare the obvious as a matter of law.

And why not? There are two reasons. The textual reason from the *Everts* court itself was that the *Hunter* court had not drawn any "distinction" between cases where creditors first sue the guarantor and cases where—as in *Everts*—the property had been sold and there was a deficiency. (However, as we have seen, the *Hunter* court did not confront Civ. Code, § 2809 at all.) And the *Everts* court quickly added that the *Hunter* court had "held" that the antideficiency statute "has no application to an action based upon the independent obligation of a guarantor." (*Everts, supra*, 21 Cal.2d at p. 446.) In short, an idea that the *Hunter* court had backed into indirectly as a minor support for a statute of limitations problem had now hardened into black-letter law.

The second reason is that the *Everts* court had no real reason to subject either *Hunter* or *Loeb* to critical analysis and determine whether either case had really confronted the problem of the impact of the 1933 antideficiency legislation on guarantors. There was no need because the guarantor was going to win the case anyway.

It turned out that the guarantor in *Everts* was actually the principal debtor all along, so antideficiency legislation did apply. (See *Everts, supra*, 21 Cal.2d at p. 450.) The *Everts* court taketh away, but it also giveth: What *Everts* took from guarantors by way of dicta (it was dicta because, given the ultimate outcome, it wasn't necessary even to address Civ. Code, § 2809 at all) the court gave back by a firm holding that when the guarantor is liable as a principal obligor, it *is* entitled to antideficiency protections. Of course, what the court had taken was a great deal more than what it had given: Bona fide guarantors, as distinct from sham alter egos of the debtor, were now clearly excluded from the protections otherwise afforded principals by antideficiency legislation.

And after *Everts*, there was simply no getting that rather off-putting dye out of the garment. In the wake of the decision, the only real defense left to guarantors when they are sued on deficiencies is the proposition that they are, "in reality," the "primary obligor." (*Mariners Sav. & Loan Assn. v. Neil* (1971) 22 Cal.App.3d 232, 235 [99 Cal.Rptr. 238].)

The present case, for example, is a species of that doctrine, with the Hustwits desperately trying to fit themselves into the "in reality" category. As the majority correctly decides—well, correctly under the current state of the

case law—the Hustwits simply outwitted themselves. They have to take the rough with the smooth, and, more specifically, cannot avail themselves of the protections of limited liability corporations and at the same time claim an obligation is really theirs. Sometimes piercing the veil can actually help you.

Meanwhile, for most of the 20th century, property values in California remained stable or increased (with the exception of a major deflation in the early 1990's), so the impetus to reexamine the doctrine that the *Loeb*, *Hunter* and *Everts* decisions had together created almost by accident was removed.

That impetus may again be with us and in any event will be present in any period of significant real property deflation. Given such conditions, there is a real danger that, under the effect of current case law, lenders will seize the noncoverage of guarantors as a loophole to circumvent antideficiency protections otherwise afforded homeowners: Just get the parents or other relatives to guarantee the loan. Since the guarantee obligation has been held "independent" of the loan, the lender can obtain a deficiency judgment under deflationary conditions.

The Legislature, of course, can readily cure this danger (as it can cure any nonconstitutionally created anomaly in the law with the right drafting). Civil Code section 2809 could be amended to say—"and we mean it," i.e., that the protection afforded guarantors against "more burdensome" obligations than undertaken by the debtors whose debts they guarantee really does apply in the context of antideficiency protections.[4]

However, the problem was created by the courts in the first place—well, okay—by the Supreme Court in the first place back in the years following the Depression—so it is judicially solvable as well. I have no doubt that the modern Supreme Court of today would not stumble into major doctrine the way the court of the mid-1930's and early 1940's did in *Loeb*, *Hunter* and *Everts*. The Supreme Court certainly has the power to reexamine the rather tenuous antecedents of the proposition that Civil Code section 2809 does not apply in antideficiency contexts, particularly given that the *Everts* court seemed to recognize that it *should* and declined to do so only in deference to

---

[4] It would be good idea at the same time to make it clear that Civil Code section 2825 ("A surety is not exonerated by the discharge of his principal by operation of law . . . .") does *not* apply to preclude antideficiency otherwise extended. The idea of Civil Code section 2809, as explained in *Bloom v. Bender* (1957) 48 Cal.2d 793, 802 [313 P.2d 568] (a case not otherwise concerned with antideficiency legislation, there the guarantee was for the credit of a sportswear manufacturing company) is that the guarantor undertakes the same obligation as the debtor as dictated by the "conditions" at the time of the execution of the guarantee. Well, at the time of the execution of most guarantees backing up a home mortgage, the *condition* undertaken by the principal debtor is the condition of not having to worry about deficiency judgments.

decisions that really never decided the issue in the first place. Perhaps with the current subprime crisis, the time has come for our high court to complete the thought it first toyed with back in 1942.

Appellants' petition for review by the Supreme Court was denied September 24, 2008, S165259. Corrigan, J., did not participate therein.