Filed 4/2/15

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| CADC/RAD VENTURE 2011-1 LLC,<br><br>    Plaintiff, Cross-defendant, and<br>    Appellant,<br><br>v.<br><br>RICHARD J. BRADLEY et al.,<br><br>    Defendants, Cross-complainants,<br>    and Appellants. | A140420 & A140923<br><br>(Napa County<br>Super. Ct. No. 2658559) |


**INTRODUCTION**

Plaintiff brought this deficiency action to enforce commercial guaranty agreements executed by defendants Richard J. Bradley and G. Reynolds Yates. Defendants argued the guaranties were shams, and therefore unenforceable, due to their close relationship with the borrower on the subject loan, Nohea Napa Gateway, LLC (Nohea). Defendants in turn brought a counterclaim against plaintiff, as well as its servicing agent, Sabal Financial Group, LP (Sabal), asserting their attempts to enforce the guaranties constituted an unfair business practice in violation of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.).

Under California law, a lender may not pursue a deficiency judgment against a borrower where the sale of property securing a debt produces proceeds insufficient to cover the amount of the debt. Lenders may pursue deficiency judgments against

guarantors, but only true guarantors. Where the borrower and the guarantor are the same, however, the guaranty is considered an unenforceable sham.

Here, the jury found in favor of defendants on the sham guaranty issue, and the trial court rejected defendants' UCL counterclaim. Plaintiff now appeals on the ground that substantial evidence does not support the jury's finding that the guaranties were shams.[1] We agree and reverse. Additionally, defendants appeal contending the trial court erred in entering judgment in favor of plaintiff on their UCL claim. We find defendants' contentions on this issue without merit and affirm the trial court's ruling on the counterclaim.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The loan and guaranties that give rise to this action were executed in connection with the purchase of a 7.38-acre parcel of undeveloped land in Napa (the Napa property). Defendants Bradley and Yates initially discussed purchasing the property as part of an exchange under Internal Revenue Code section 1031 (1031 exchange). Through a 1031 exchange, a taxpayer can defer taxes on gains from the sale of a property by using those gains to purchase a second property. (26 U.S.C. § 1031.) Where the exchange property is purchased first, an exchange accommodation titleholder (EAT) may temporarily hold the property and then transfer it to the taxpayer. In this case, defendants considered using the Napa property as an exchange property in which they could invest proceeds from the sale of the Interurban building, a Seattle property owned by No Boundaries, Ltd (No Boundaries). No Boundaries is a Washington corporation of which defendants each own 50 percent, and which they share with their spouses as community property. In its loan application documents, No Boundaries submitted financial statements reflecting assets

_____

[1] Plaintiff also argues the trial court committed reversible error by instructing the jury on sham guaranty law, refusing to bifurcate the trial, and allowing the introduction of evidence relevant to defendants' counterclaim. The merits of these claims are dubious, but we need not, and do not, reach them.

2

during the period of 2003–2005 in excess of $6.5 million, along with other information indicating corporate financial activity.

In February 2006, Bradley offered to purchase the Napa property, made the initial $50,000 deposit, and executed a real estate purchase agreement, through which he agreed to buy the property subject to certain terms and conditions. Shortly thereafter, defendants approached plaintiff's predecessor-in-interest, Charter Oak Bank (Charter Oak), about obtaining a loan. On February 24, 2006, Michael Ledwich, a vice-president at Charter Oak, indicated the bank needed to review the purchase agreement and various financial information from the borrowing entity and its principals. He did not specify what that borrowing entity should be or the form it should take.

In March 2006, No Boundaries submitted a loan application to Charter Oak. After reviewing the financial information of No Boundaries and defendants, Charter Oak approved the loan on May 31, 2006. The loan approval documents indicate Charter Oak expected an EAT would initially assume the loan and then transfer its obligations to No Boundaries for the purposes of a 1031 exchange. These documents also indicate Charter Oak considered the primary source of repayment to be No Boundaries and the secondary source to be defendants, who would guaranty the loan. Charter Oak policy required loan guaranties from any individuals owning more than 20 percent of a borrowing entity. Ledwich indicated the purpose of this policy was to "pierce the corporate veil of the borrower."

On June 6, 2006, two days before the loan agreement was executed, defendants decided to switch the borrowing entity from No Boundaries to Nohea. A tax consultant hired by defendants to assist with the 1031 exchange indicated the change was necessary to avoid California withholding tax consequences. Nohea was just an idea at this point, but on June 13, 2006, it filed with the California Secretary of State limited liability company articles of organization. Defendants were later appointed as managers of Nohea.

3

Charter Oak was informed of the change in borrowers on June 7, 2006. It did not request any financial information from Nohea. Ledwich understood Nohea's only asset would be the Napa property. He testified Charter Oak was willing to allow Nohea to assume the loan because defendants had enough money to justify an extension of credit, and the name of the borrower was not a critical component of the deal.

On June 8, 2006, two days after the idea of Nohea was conceived, Nohea and Charter Oak executed a business loan agreement for $2.1 million. The loan was secured by a deed of trust against the Napa property executed by Nohea in favor of Charter Oak. Both defendants executed commercial guaranties for the full amount of the loan. As part of the guaranty agreements, defendants waived all their rights and defenses under California's antideficiency statutes.

The following day, Bradley, No Boundaries, Nohea, and an EAT executed an assignment agreement, an exchange agreement, and a lease. Under the assignment agreement, Bradley assigned his rights to purchase the Napa property to Nohea. The exchange agreement indicated the EAT was the sole owner of Nohea, and the EAT and Nohea would hold the Napa property for the benefit of No Boundaries in order to facilitate the 1031 exchange. The agreement further provided that, within 180 days, the EAT would deliver to No Boundaries all of its interest in Nohea. Additionally, Nohea agreed to lease the Napa property to No Boundaries. The lease agreement provides that No Boundaries was responsible for all interest and principal payments on the loan, as well all utilities and taxes.

As a result of these agreements, Nohea owned the Napa property, No Boundaries owned Nohea, and defendants were poised to complete the 1031 exchange. There is evidence that both Charter Oak and plaintiff, who would later assume Charter Oak's interests in the loan, mistakenly believed defendants owned Nohea. Defendants and their spouses did own No Boundaries, but there is no indication they ever held a direct ownership interest in Nohea.

4

No Boundaries's tax returns reflect that the company sold the Interurban building in 2006. No Boundaries realized a $6,640,897 gain from the sale, and it was able to defer taxes on that gain through the 1031 exchange.

In July 2009, Charter Oak and Nohea agreed to renew the loan and modify some of its terms. Charter Oak understood Nohea was still a single-asset entity and, thus, did not request any financial information from the company in connection with the 2009 agreements. By this point, only Bradley and No Boundaries were providing Charter Oak with financial information. The bank had abandoned all attempts to collect financial information from Yates in 2008, sometime after he declined to comply with its information requests. Although No Boundaries had been making timely loan payments, Charter Oak found the company was not generating sufficient cash flow to service the debt. The bank concluded Bradley was the financial strength of the loan.

In February 2011, the state closed Charter Oak and the FDIC was appointed as receiver. In June 2011, the loan matured, and Nohea was obligated to pay all amounts owing. Nohea went into default. During this period, defendants communicated with a representative of Midland Loan Services (Midland), which was servicing the Nohea loan on behalf of the FDIC, about the possibility of a loan modification. The Midland representative informed defendants that the FDIC could either take the Napa property or sue and try to enforce the loan, but it could not do both. In July 2011, defendants and Midland discussed the possibility of a deed in lieu of foreclosure, which was conditioned upon the results of a title search and an environmental study for the Napa property.

In August 2011, plaintiff acquired a number of Charter Oak's loans from FDIC, including the Nohea loan. About two months later, Sabal[2] replaced Midland as the servicer on the loan. Plaintiff and Sabal commenced foreclosure proceedings in January

---

[2] Sabal is the servicer for CADC's entire loan portfolio. Though Sabal is ostensibly an agent, defendants assert that it runs CADC.

2012. In August 2012, plaintiff purchased the Napa property at a foreclosure sale for $1.2 million. The unpaid balance on the loan far exceeded the sale price and about $1.3 million remained due and owing under defendants' guaranties.

In March 2012, plaintiff filed this action for breach of written guaranties to recover the deficiency. Defendants asserted a number of affirmative defenses in their answer, including that the guaranties were unenforceable shams. Defendants also filed a cross-complaint against plaintiff for, among other things, violating the UCL by attempting to enforce sham guaranties. Additionally, the cross-complaint asserted a claim against Sabal for conspiracy to violate the UCL. The trial court denied the parties' cross-motions for summary judgment, and the case proceeded to trial. The jury returned a verdict for defendants on plaintiff's claims for breach, and found that even if plaintiff had committed a UCL violation, Sabal was not liable for conspiracy. The trial court rejected defendants' UCL claim against plaintiff. Plaintiff subsequently filed a motion for judgment notwithstanding the verdict (JNOV) and a motion for a new trial, both of which were denied.

## DISCUSSION

### I.      *California's Antideficiency Statues and the Sham Guaranty Defense*

California's antideficiency statutes are codified at Code of Civil Procedure sections 580a through 580d and 726.[3] In relevant part, the statutes provide: "[N]o deficiency judgment shall be rendered for a deficiency on a note secured by a deed of trust or mortgage on real property . . . in any case in which the real property . . . has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust." (§ 580d, subd. (a).) These protections cannot be avoided by artifice or waived

---

[3] Hereinafter, all statutory references are to the Code of Civil Procedure unless otherwise specified.

6

through a private agreement.  (*Commonwealth Mortgage Assurance Co. v. Superior Court* (1989) 211 Cal.App.3d 508, 515.)

"[E]nacted during the depression, [these provisions] limit or prohibit lenders from obtaining personal judgments against borrowers where the lender's sale of real property security produces proceeds insufficient to cover the amount of the debt."  (*Talbott v. Hustwit* (2008) 164 Cal.App.4th 148, 151 (*Talbott*).)  They reflect "a considered course on the part of the Legislature to limit strictly the right to recover deficiency judgments." (*Brown v. Jenson* (1953) 41 Cal.2d 193, 197.)  The statutes were designed to accomplish several objectives: " '(1) to prevent a multiplicity of actions, (2) to prevent an overvaluation of the security, (3) to prevent the aggravation of an economic recession which would result if creditors lost their property and were also burdened with personal liability, and (4) to prevent the creditor from making an unreasonably low bid at the foreclosure sale, acquire the asset below its value, and also recover a personal judgment against the debtor.' "  (*Torrey Pines Bank v. Hoffman* (1991) 231 Cal.App.3d 308, 318 (*Torrey Pines*).)  Accordingly, " 'the courts have exhibited a very hospitable attitude toward the legislative policy underlying the anti-deficiency legislation and have given it a broad and liberal construction that often goes beyond the narrow bounds of the statutory language.' "  (*Prunty v. Bank of America* (1974) 37 Cal.App.3d 430, 436.)

The antideficiency statutes do not affect the liability a guarantor might otherwise have with respect to a deficiency.  (§ 580d, subd. (b).)  Thus, a lender may recover a deficiency judgment from a guarantor who waives his or her antideficiency protections, even though the antideficiency statutes would bar the lender from recovering that same deficiency from the primary borrower.  (*Cadle Co. II v. Harvey* (2000) 83 Cal.App.4th 927, 932.)  "However, to collect a deficiency from a guarantor, he must be a true guarantor and not merely the principal debtor under a different name."  (*Ibid.*)  When the principal borrower takes on additional liability as a guarantor, that guaranty is a sham and

7

adds nothing to the primary obligation. (*Ibid.*) California law does not define a sham guaranty, and California courts have yet to enunciate a bright line test.

A threshold issue in sham guaranty cases is whether the guarantor of a loan is also obligated as a borrower. In *Riddle v. Lushing* (1962) 203 Cal.App.2d 831, 832–833, the two defendants took out a loan under the name of their partnership and also guarantied the loan as individuals. Applying principles of partnership law, the court held the guaranties were shams: "Since defendants were already primary obligors, both jointly and severally, they could not also be . . . guarantors on the partnership note. The purported guaranty added nothing to the primary liability which arose when they as partners executed the note in the name of the partnership." (*Id.* at p. 834.)

Similarly, in *Valinda Builders, Inc. v. Bissner* (1964) 230 Cal.App.2d 106, 107, the defendants guarantied a loan taken out by their corporation, which was organized for the sole purpose of taking on the loan. The corporation had a paid-in capital of only $200, and the defendants and their wives were its only stockholders, directors, and officers. (*Ibid.*) The court concluded there was no evidence the corporation was anything other than "an instrumentality used by the individuals or that defendants were ever removed from their status and obligations of purchasers." (*Id.* at p. 110.) Thus, "the alleged guaranty of defendants was no more than a promise to pay their own debt." (*Ibid.*)

Alter ego principles were relied upon in *Torrey Pines*, *supra*, 231 Cal.App.3d 308. There, the defendants borrowed money using their family trust, of which they were the settlors, trustees, and beneficiaries. (*Id.* at pp. 313–314.) The lender also required the defendants to personally guaranty the loan. (*Id.* at p. 314.) The court held the guaranty was unenforceable since the defendants were nothing more than the principal obligors under another name. (*Id.* at p. 320.) The court reasoned that under the principles of trust law, the defendants "were personally liable on the contract they entered into on behalf of the trust." (*Id.* at p. 321.)

8

In contrast, in *Talbott*, *supra*, 164 Cal.App.4th 148, the court found enforceable guaranties executed in connection with a loan to a trust. The court concluded the defendants were true guarantors because the trust arrangement provided them with a significantly greater degree of separation than in *Torrey Pines*. (*Talbott*, at p. 153.) The defendants were only secondary beneficiaries of the trust, and they used a limited liability company as trustee, thus limiting their personal liability for the trust's obligations. (*Ibid.*)

In assessing sham guaranty claims, several courts have also considered whether the *lender* structured the transaction to circumvent the protections of the antideficiency laws. For example, in *Union Bank v. Brummell* (1969) 269 Cal.App.2d 836, 837–838 (*Brummell*), the defendants originally intended to purchase the property given as security, but the lender "advised or required them" to transfer title to the property to a preexisting corporation solely owned by the defendants. (*Id.* at p. 838.) The court found the guaranties the defendants executed in connection with the loan were shams, reasoning "[t]he legislative purpose against deficiency judgments may not be subverted by use of a corporation with the true principal obligor relegated to the position of guarantor." (*Ibid.*)

A similar conclusion was used in *River Bank America v. Diller* (1995) 38 Cal.App.4th 1400 (*River Bank*). There, the plaintiff tried to enforce guaranties executed by the defendants in connection with a loan made to a limited partnership of which the defendants' corporation was the general partner. (*Id.* at pp. 1407–1408 & fn. 4.) The court reversed the trial court's grant of summary judgment in favor of the lender. (*Ibid.*) The court decided the borrower had raised a triable issue of fact as to whether the lender structured the transaction to avoid the purpose of the antideficiency laws based on evidence the lender relied on extensive financial statements from the guarantors but never inquired about the financial standing of the borrower. (*Id.* at p. 1423.) The court also concluded the " 'purpose and effect' of the agreements" was pertinent, since there was evidence that the lender required the borrower to be a limited partnership and insisted that one of the defendants be removed as general partner so it

9

could be replaced with a shell corporation. (*Ibid.*) In *River Bank*, the court concluded the lender "subverted" the purposes of the antideficiency laws by imposing specific directives on the loan to the principal obligor. (*Ibid.*) The court held it was not conclusive that the general partner was a long-standing corporation that adhered to all formalities or that the debt did not directly obligate the corporation's shareholders and officers, reasoning the lender structured the transaction to relegate the obligors to the position of guarantors. (*Id.* at pp. 1423–1424.)

Brummell* and *River Bank* were distinguished in *California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, where the court affirmed an order granting summary judgment against the defendant guarantors. The court reasoned the defendants were not the primary obligors on the loans because there was legal separation between them and the borrowing entities, which were a limited liability company and a limited partnership. (*Id.* at p. 638.) The court also rejected the defendants' argument that the principal purpose of the entities was to hold title to the real property security for the loans, since there was no indication the entities were improperly formed or failed to observe the necessary formalities that usually protect their owners from corporate liabilities. (*Id.* at p. 639.) Unlike in *Brummell* and *River Bank*, there was no evidence the lender structured the transaction to relegate the defendants to the role of guarantors. (*Lawlor*, at pp. 639–640.) Instead, the record showed the defendants formed the borrowers to protect themselves from liability. "Individuals may structure their own business dealings to limit their personal liability, but they must accept the risks that accompany the benefits of incorporation." (*Id.* at p. 639.) Structured separation can make a party a true guarantor, voiding antideficiency law protections. The court also held there was nothing unusual about a lender requesting financial information about a guarantor, and there was no evidence the lender did not also request information from the borrowing entities. (*Id.* at p. 640.)

From these cases the following principles may be derived:  A guaranty is an unenforceable sham where the guarantor is the principal obligor on the debt.  This is the case where either (1) the guarantor personally executes underlying loan agreements or a deed of trust, or (2) the guarantor is, in reality, the principal obligor under a different name by operation of trust or corporate law or some other applicable legal principle.  The legislative purpose against deficiency judgments may not be subverted by use of a borrowing entity with the true principal obligor relegated to the position of guarantor.  Thus, courts may find a sham guaranty where a lender structures a transaction to avoid antideficiency protections, even though the borrowing entity is a properly formed corporation that observes the necessary formalities.  However, a sham guaranty defense generally will not lie where there is adequate legal separation between the borrower and the guarantor, e.g., through the appropriate use of the corporate form.

## II.      *Substantial Evidence Does Not Support the Jury's Verdict on the Sham Guaranty Defense*

Plaintiff argues we should reverse the trial court's denial of its JNOV motion because the verdict is not supported by substantial evidence.  On substantial evidence review, we "must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court." (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.)  "We may not substitute our view of the correct findings for those of the [jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [jury]'s decision." (*Ibid*.)  "Substantial evidence, of course, is not synonymous with 'any' evidence . . . ." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.)  Rather, it is "evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  The focus is on the quality, not the quantity, of the evidence. (*Ibid.*)

11

There is no dispute that defendants executed guaranty agreements in connection with the subject loan, or that they waived their antideficiency protections in the process. The principal question on appeal is whether defendants' guaranties were shams. As discussed above, a guaranty is a sham where the guarantor is the principal obligor on the debt, either because he or she personally executed the note or deed of trust, or because the guarantor is liable for the debts of the borrower by operation of some legal principle. (See, e.g., *Torrey Pines*, *supra*, 231 Cal.App.3d at p. 320.) Where there is legal separation between the borrower and guarantor, however, the guaranty is enforceable unless the loan transaction has been structured to subvert the antideficiency laws. (See, e.g., *River Bank*, 38 Cal.App.4th at pp. 1423–1424.) We conclude substantial evidence does not support a finding that defendants' guaranties were shams.[4,5]

---

[4] Defendants argue that plaintiff waived its substantial evidence challenge because its statement of facts is "entirely devoid of evidence that supported the jury's verdict." However, defendants fail to detail what evidence plaintiff excluded from its brief. Defendants' primary concern is that plaintiff "spins" the evidence in its favor, and that it "blend[s]" the loan to Nohea with the bank's actions related to No Boundaries. However, as set forth below, the relationship between No Boundaries and Nohea is central to this dispute. Moreover, the only significant difference between plaintiff's and defendants' statement of facts is their discussion of the evidence related to defendants' UCL claim, evidence which is irrelevant to plaintiff's appeal.

[5] Because the verdict is not supported by substantial evidence, plaintiff's arguments regarding the trial court's sham guaranty instructions are moot. In any event, we agree with defendants that plaintiff forfeited the argument by failing to object at trial. But we observe that plaintiff's criticism of the instructions have merit. The trial court instructed the jury the defendants had the burden to prove that "the purported debtor is nothing other than an instrumentality used by the individuals who guaranteed the debtor's obligation; and . . . the instrumentality does not remove the individuals from their status and obligation as debtors." It also stated: "Even when a corporation is a nominal borrower and the debt is guaranteed by its officers and shareholders, the guaranties may nevertheless be sham guaranties. This is true even though the corporation's debt does not directly obligate the shareholders and officers." The latter quotation is a close paraphrase of *River Bank*, *supra*, 38 Cal.App.4th at page 1424. But stripped of context, the paraphrase offers an incomplete and potentially misleading statement of the law. The court's instructions essentially state there is an exception to the general rule a guaranty is

12

### A. *Defendants were not the primary obligors on the loan or deed of trust*

It is undisputed that defendants did not personally execute the deed of trust against the Napa property. Nohea was the borrower on the loan. Defendants assert they are nevertheless the primary obligors on the loan because Nohea is merely a shell and they are its alter ego. Looking at the facts in the light most favorable to defendants, the argument fails as a matter of law. In light of the legal separation between defendants and Nohea, we cannot conclude there is an alter ego relationship or that defendants are directly liable for Nohea's debts.

Though there is no litmus test to determine alter ego liability, there are two general requirements: " '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist[,] and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.) The unity of ownership and interest demonstrated in the two personalities is reflected in the ownership by the individual in the stock of the corporation; when it is absent, the alter ego doctrine is generally unavailable. (*Riddle v. Leuschner* (1959) 51 Cal.2d 574, 580.) Under California law, "[o]wnership is a pre-requisite to alter ego liability, and not a mere 'factor' or 'guideline.' " (*S.E.C. v. Hickey* (9th Cir. 2003) 322 F.3d 1123, 1128.) Conditions under which the corporate entity may be disregarded vary by circumstance, but courts often consider commingling of funds, personal use of corporate assets, inadequate corporate records, lack of employees, offices, or operating funds, and inadequate capitalization. (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811.)

---

enforceable where there is legal separation between the borrower and guarantor, but they do not explain when or how that exception applies. Thus, as plaintiff argues, the court's instructions had the potential to turn a limited exception to enforcing guaranties into an unlimited alternative test.

Here, defendants do not have a direct ownership interest in Nohea. The company was originally owned by an EAT and later transferred to No Boundaries. Moreover, No Boundaries, not defendants, made Nohea's payments under the loan. Defendants contend direct ownership is not required, pointing out that they own No Boundaries with their wives, and that Bradley made the initial down payment on the Napa property. But even if Nohea is merely a shell controlled by No Boundaries and alter ego principles allow for the simultaneous piercing of two corporate veils, defendants still need to establish that we should disregard No Boundaries's corporate form. They have failed to do so. The evidence shows No Boundaries observed the necessary formalities, including passing corporate resolutions, holding corporate meetings, and maintaining separate bank accounts and assets.

Defendants also assert that, at the time the loan agreement was executed, Nohea was still without an owner, indicating the entity merely existed to serve their interests. As defendants point out, in some situations, a corporation's failure to allocate ownership or stock may support an alter ego finding. (*Automotriz Etc. De California v. Resnick* (1957) 47 Cal.2d 792, 796.) But Nohea did not remain inchoate for long. Agreements executed the day after the loan indicate the EAT would take ownership of Nohea and subsequently assign its interest to No Boundaries. The assignment to No Boundaries was executed four months later. Moreover, defendants' tax consultant informed Charter Oak of this plan before the loan was finalized. In contrast, in the cases relied upon by defendants, the corporations at issue never allocated ownership interests or issued stock. (See *Resnick*, at p. 798; *Marr v. Postal Union Life Ins. Co.* (1940) 40 Cal.App.2d 673, 682; *Geisenhoff v. Mabrey* (1943) 58 Cal.App.2d 481, 489–490; *Claremont Press Publishing Co. v. Barksdale* (1960) 187 Cal.App.2d 813, 815.)

Defendants also make much of the fact that Ledwich, the Charter Oak vice-president who managed the loan, was under the impression defendants owned Nohea directly. Ledwich's misunderstanding suggests defendants held themselves out as liable

14

for Nohea's debts, a factor that traditionally favors an alter ego finding. (*Zoran Corp. v. Chen*, *supra*, 185 Cal.App.4th at p. 811.) But this factor has never been determinative. (*Ibid.*) Moreover, it is entitled to little weight in this context. To hold otherwise would allow a guarantor to unilaterally render its own commitment a sham by misstating its relationship to the borrower. We are aware of no authority holding that a guarantor may create confusion about its relationship to a borrower and then use that confusion to invoke the protections of the antideficiency laws.

Because defendants own Nohea through No Boundaries, and because No Boundaries is legally distinct from defendants, we cannot conclude defendants are directly liable for Nohea's obligations. To the extent the jury's verdict was based on such a finding, it cannot be squared with the law.

### B. *Charter Oak did not structure the loan transaction to subvert the antideficiency laws*

That defendants are not directly liable for the debts of Nohea does not end our inquiry. We may also take into account equitable considerations, including whether Charter Oak structured the loan transaction to subvert the antideficiency laws. (See, e.g., *River Bank*, *supra*, 38 Cal.App.4th at 1423–1424.) In doing so, we consider whether Charter Oak relegated defendants to the position of guarantors or otherwise dictated the structure of the loan transaction. (See *ibid*.) Viewing the evidence in the light most favorable to the verdict, we conclude these equitable concerns do not support finding a sham guaranty.

Unlike in cases such as *River Bank*, *supra*, 38 Cal.App.4th at page 1421, and *Brummell*, 269 Cal.App.3d at page 838, there is no indication Charter Oak forced defendants to borrow through a shell entity or that it dictated the form that shell entity should take. When defendants applied for the loan, they chose to do so through No Boundaries, which they had owned since 1994. Later, on the advice of a tax consultant, *defendants* switched the borrowing entity to Nohea so they could avoid California's

15

withholding tax.  Charter Oak assented to the change in borrowers, but played no role in Nohea's selection or creation.  Defendants assert Bradley's first communication with Charter Oak indicated he wanted to purchase the Napa property for himself, yet Charter Oak's response specifically steered defendants towards a corporate borrower by asking for a borrowing entity and the borrowing entity's corporate records and financial information.  But there is a significant difference between requesting information about a borrowing entity and insisting upon the use of one and the form that it should take.

Moreover, the record reflects that defendants were interested in using a corporate borrower—first No Boundaries and then Nohea—so they could take advantage of various tax breaks.  It is undisputed defendants considered using the purchase of the Napa property in conjunction with the sale of No Boundaries's Seattle property to perform a 1031 exchange, which would allow No Boundaries to defer taxes on the sale proceeds.  Emails from Yates indicate defendants understood No Boundaries would need to take ownership of the Napa property to complete the transaction.  Consistent with this understanding, defendants initially selected No Boundaries as the borrower.  Though No Boundaries was later replaced by Nohea, defendants still planned to carry out the 1031 exchange.  The day after they agreed to the loan, defendants executed contracts transferring Nohea, along with its interest in the Napa property, to No Boundaries.

Defendants argue the 1031 exchange is irrelevant.  They assert Bradley testified he was initially interested in purchasing the Napa property in his own name, and the 1031 exchange had been discussed as a mere possibility.  Defendants also point out there was a chance the 1031 exchange would not go through, since the Napa property was purchased before the Seattle property was sold.  But this merely shows defendants had additional reasons for purchasing the Napa property.  Regardless of what those other reasons were, defendants clearly intended to take the steps necessary to complete the 1031 exchange, including selecting the appropriate borrowing entity.

16

Nor does Ledwich's testimony show the bank structured the transaction to circumvent the antideficiency laws.  As defendants point out, Ledwich stated the purpose of requiring guaranties was to "pierce the corporate veil of the borrower and to get at the guarantors."  Ledwich also agreed with defense counsel's statements that the purpose of the transaction was "to enable [defendants] to take possession of the [Napa] property," and "to assist not No Boundaries but [defendants]."  But Ledwich's statements shed no light on whether Charter Oak insisted on the use of a borrowing entity or played any role in its selection.

Defendants also contend their guaranties were shams because Charter Oak looked only to them to maintain the loan, and it never reviewed the financial information of Nohea, the actual borrower.  As defendants point out, courts have been inclined to find an attempt to subvert the antideficiency laws where the lender considers only the financial strength of the guarantor, since such facts indicate the lender considers the guarantor to be the true borrower.  (See *River Bank*, *supra*, 38 Cal.App.4th at p. 1423.)  But we do not believe such circumstantial evidence should be accorded weight in all cases, especially where, as here, a defendant chooses to borrow through a corporation for tax purposes.  In any event, Charter Oak did request and consider financial information from No Boundaries, which was the sole owner of Nohea and made Nohea's loan payments.  Moreover, substantial financial assets passed through these corporations, namely the millions realized from the sale of the Seattle property.  As defendants point out, Charter Oak concluded in 2009 that No Boundaries lacked sufficient cash flow to maintain the loan; but by that point, the bank had already approved the loan and was merely considering whether to modify its terms.

Ultimately, this issue turns on a question of law:  Can guarantors disclaim their antideficiency waivers if they decide to borrow through a shell entity for their own purposes and there is adequate legal separation between the guarantors and the borrower?  While the antideficiency statutes and case law do not directly speak to this issue, we

17

believe the answer must be no. Where individuals purposefully take advantage of the benefits of borrowing through a corporate entity, they must also assume the risks that come with it.[6]

### III. Substantial Evidence Supports the Trial Court's Ruling on Defendants' UCL Claim

Defendants' UCL claim against plaintiff was predicated on the theory that plaintiff's attempt to enforce their guaranties constituted an unfair and unlawful business practice. The trial court found for plaintiff on the claim. The court reasoned it was a close question whether the guaranty was a sham, and thus plaintiff's attempt to enforce the guaranty was not in bad faith. As the trial court's determination of the UCL claim involved disputed facts or inferences drawn from undisputed facts concerning, inter alia, plaintiff's policies and its prior knowledge of various facts, we review its findings for substantial evidence.[7] (*Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.* (2012) 204 Cal.App.4th 1214, 1222.)

The UCL prohibits any unfair, unlawful, or fraudulent business act or practice. (Bus. & Prof. Code, § 17200.) Only the first two types of practices are at issue here. A practice is unlawful under the UCL where it violates a predicate law. (*Cel-Tech*

---

[6] Defendants also argue that plaintiff failed to prove it was damaged by virtue of any breach of the written guaranties. They reason that an independent professional appraisal conducted in April 2012 showed the property was worth more than the amount due and owing on the debt, and that plaintiff failed to mitigate its damages by waiting to sell the property until August 2012. Even putting aside the vagaries and unpredictability of the real estate market, pursuant to their guaranty agreements, defendants waived their right to a fair value hearing under Code of Civil Procedure section 580a. The guaranties provide that defendants' "obligation may be reduced only by the price for which the collateral is sold at foreclosure sale, even if the collateral is worth more than the sale price."

[7] Defendants argue their cross-appeal should be reviewed de novo since the trial court's application of the UCL was purely a legal question. But as evidenced by defendants' own brief, the resolution of their counterclaim turns on a number of factual questions. In any event, because we find that the guaranties at issue are not shams, defendants' claim that plaintiff's attempts to enforce them are unfair and unlawful would also fail under de novo review.

18

*Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)  The standards applicable to a UCL unfairness claim are something of a moving target.  (See *Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 252.)  Some courts consider whether the injury is substantial, is not outweighed by any countervailing benefits, and could not have been avoided by the plaintiff.  (*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403.)  Others require the public policy underlying the claim be tethered to specific constitutional, statutory, or regulatory provisions.  (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1260–1261.)  Still others consider whether the practice is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers . . . weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  (*Id.* at p. 1260.)

Here, defendants argue plaintiff's attempt to enforce their guaranties after pursuing nonjudicial foreclosure were both unfair and unlawful under the so-called "one-action rule," which provides that there can be but one form of action for recovery of any debt secured by a mortgage upon real property.  (§ 726.)  Defendants also assert that Midland, which serviced the loan before it was assigned to plaintiff, specifically stated California law prohibited multiple actions to collect the debt.  But defendants waived their antideficiency protections, including the protections embodied in the one-action rule, when they executed their guaranties and, as set forth above, we find these guaranties are valid and enforceable.  (See *Cadle Co. II v. Harvey*, *supra*, 83 Cal.App.4th at p. 932 ["[I]f a guarantor expressly waives the protections of the antideficiency laws, a lender may recover the deficiency judgment against the guarantor even though the antideficiency laws would bar the lender from collecting that same deficiency from the primary obligor."].)

Defendants also argue plaintiff's attempt to enforce the guaranties was unfair because plaintiff had extensive information that Midland, which acted as the loan servicer

19

for both FDIC and plaintiff, had communicated with defendants about the possibility of a deed in lieu of foreclosure. According to defendants, despite Midland's representation that plaintiff would be in a position to work with them to resolve the debt once it took over the loan, plaintiff transferred servicing responsibilities from Midland to Sabal, which refused to communicate with defendants and pursued nonjudicial foreclosure and then this deficiency action. Defendants concede their UCL claim is not predicated on plaintiff's failure to follow through on the deed in lieu of foreclosure, and that they are not pursuing a promissory estoppel cause of action, which was dismissed on demurrer. Instead, they assert their UCL unfairness claim is premised on plaintiff's "practice of having complete disregard for the representations made by their representative." We agree with the trial court this claim fails. Assuming defendants' theory is viable under the UCL, there is no evidence that either Midland or FDIC formally agreed to resolve defendants' default through a deed in lieu of foreclosure. The fact that Midland discussed the possibility with defendants did not obligate plaintiff or Sabal to follow through. Moreover, it was not unfair for plaintiff to exercise its legal right to pursue other options.

## DISPOSITION

The judgment on plaintiff's claim for breach of guaranties is reversed, and, given plaintiff's appeal from a denial of its JNOV motion, we direct the judgment be entered in favor of plaintiff. The judgment on defendant's claim for violation of the UCL is affirmed. Each party is to bear its own costs on appeal.

20

 

_____

Dondero, J.

We concur:

_____

Margulies, Acting P.J.

_____

Banke, J.

A140420/A140923

| | |
|---|---|
| Trial Court | Napa County Superior Court |
| Trial Judge | Hon. J. Michael Byrne |
| Counsel for Plaintiff, Cross-defendant and Appellant<br>CADC/RAD Venture 2011-1 LLC | Michael R. Farrell<br>Cathy A. Hongola-Baptista<br>Kenyon Harbison<br>Allen Matkins Leck Gamble Mallory & Natsis LLP |
| Counsel for Amicus Curiae<br>California Mortgage Bankers Association on behalf of Plaintiff, Cross-defendant and Appellant | Michael R. Pfeifer<br>Pfeifer & De La Mora, LLP |
| Counsel for Defendants, Cross-complainants and Appellants<br>Richard J. Bradley and G. Reynolds Yates | Michael P. Bradley<br>Tanis L. Kelly<br>Caitlin T. DiMaggio<br>Murphy, Pearson, Bradley & Feeney |