Filed 2/9/16  Razmco and Assocs. v. BB&T Ins. Services of California CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RAZMCO AND ASSOCIATES, INC. et al., | D066296 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2010-00102178-CU-BT-CTL) |
| BB&T INSURANCE SERVICES OF CALIFORNIA, INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Randa Trapp, Judge.  Reversed.

Duane Morris, Russell W. Roten, Katherine L. Nichols, Paul J. Killion and Kathryn T.K. Schultz for Defendants and Appellants.

Cummins & White, Larry M. Arnold and Melody S. Mosley for Plaintiffs and Respondents.

Defendants and appellants BB&T Insurance Services of California, Inc., aka BB&T-John Burnham (collectively BB&T) and at all times relevant its agent/employee, Masoud Shahri (Shahri) (sometimes collectively defendants), appeal a jury verdict of about $140,000 in compensatory and $600,000 in punitive damages in favor of plaintiffs and respondents Razmco & Associates, Inc., dba Nova Insurance Services (collectively Nova) and its principal, Bahman Bitaraf (Bitaraf) (sometimes collectively plaintiffs), on plaintiffs' cause of action for intentional interference with prospective economic advantage (IIPEA).

Defendants raise a series of contentions on appeal, including the trial court prejudicially erred in instructing the jury it consider the alleged violation of a third party insurer's private "tenets," which were adopted merely as guidelines to prevent a handful of independent insurance brokers/agents from gaining a competitive advantage over one another, in determining whether defendants engaged in independently wrongful conduct as required in an IIPEA cause of action.

As we explain, we conclude the court erred in ruling the insurer's tenets could be used as the basis to establish independently wrongful conduct for purposes of this tort. We further conclude there is no other basis in the record to establish this element. We thus reverse the judgment in favor of plaintiffs and order the trial court to enter judgment in favor of defendants.

FACTUAL AND PROCEDURAL SUMMARY

Bitaraf was an experienced taxi driver and road supervisor who in 1988 became a licensed insurance broker. Bitaraf, as noted, at all times relevant was the owner of Nova. He specialized in writing commercial transportation insurance.

At issue in this case was the placement of automobile liability insurance for the large taxi cab fleets of United Independent Taxi Drivers, Inc. (UITD) and San Gabriel Transit, Inc. (SGT). Typically, taxi companies like UITD and SGT needed insurance for automobile liability; general liability; accidental insurance, which Bitaraf described as being similar to worker's compensation for drivers; and comprehensive and collision. Bitaraf began writing insurance for SGT in 1989. Between 2002 and 2007, Bitaraf also wrote automobile liability coverage insurance for UITD.

Plaintiffs' operative complaint[1] alleged that defendant BB&T was also in the business of providing commercial transportation insurance and was a direct competitor of plaintiffs; that neither plaintiffs nor BB&T provided "insurance to their clientele directly, but rather through broker agreements between their clientele and various insurance providers"; that both plaintiffs and BB&T generally offered "insurance from common insurance providers, subject to those insurance providers' premium rates for commercial

---

[1] The record shows the court granted summary adjudication in favor of defendants on plaintiffs' causes of action for intentional and negligent interference with *existing* economic relationships. The court also separately granted without leave to amend defendants' motion for judgment on the pleadings on plaintiffs' cause of action for negligent interference with *prospective* economic relationships. Neither ruling is at issue in this appeal. At trial, plaintiffs had two remaining causes of action against defendants: IIPEA and unfair competition (Bus. & Prof. Code, § 17200 et seq.; hereafter UCL or Act).

vehicles garaged in different geographic locations and various discounts allowed for among other things, mounted cameras"; and that because of the "relatively small number of insurance brokers dealing in the public livery insurance business [i.e., commonly known as the commercial transportation business], [d]efendants . . . were aware at all times relevant . . . of [p]laintiffs' existing and prospective economic relationships with various taxi cab companies subject to this lawsuit."

Plaintiffs' operative complaint alleged that in 1999, plaintiffs entered into a "Producer Agreement" with American Business Insurance Services, Inc.—an authorized agent of Mercury Insurance Company—and related entities (Mercury). Pursuant to the terms of that agreement, plaintiffs placed coverage for large taxi cab fleets, including, as relevant here, SGT.

In 2005, plaintiffs entered into a "Consultant Agreement" with Ken Spiker Associates, Inc., another authorized agent of Mercury. The complaint alleged that as a producer through Ken Spiker Associates, Inc., plaintiffs placed coverage with Mercury for other large taxi fleets, including, as relevant here, UITD.

The complaint alleged that when Mercury implemented its public livery coverage, it established guidelines or "basic tenets" that it expected brokers and agents to follow, including, as relevant here: "Mercury will offer the same quote, given equal documentation, to a prospect not currently a Mercury policyholder. The company will not allow the agent/broker a competitive advantage over another Mercury producer by relinquishing commission for a reduced rate over another Mercury quote" (hereafter the

4

commissions tenet); and "Mercury will not condone special monetary, gift or favors incentivizing arrangements outside of the premium quote to attract the business in competition with another Mercury [a]gent/[b]roker. Discovery of any of these types of incentives by the Company will be grounds for discipline which may include termination of the [agency] contract" (hereafter the incentives tenet). (Original emphasis omitted.)

The operative complaint further alleged that insurance providers' premium rates are "generally determined by the location in which the commercial vehicles are kept or 'garaged' in the normal course of business"; that the premium rates for vehicles garaged in the City or County of Los Angeles were typically higher than the rates for vehicles garaged in the City of Palm Springs or San Bernardino County; and that Shahri, on behalf of himself and BB&T, "misrepresented to existing clients [i.e., SGT] and potential new clients of BB&T . . . that he could offer them insurance policies for their commercial vehicles fleets garaged in the City of Los Angeles and/or Los Angeles County at the same rate as for those commercial vehicles fleets garaged in Palm Springs and/or San Bernardino County."

The operative complaint alleged Shahri also misrepresented to Mercury "where the clients' vehicles were actually garaged (e.g., Palm Springs or Riverside instead of Los Angeles) in order to get a lower premium rate quote from the insurance provider than the actual garaging location would have obtained, and then offered that rate to the client [i.e., SGT] or potential client. Based on these false pretenses, [d]efendants were able to

5

acquire more business from existing clients than they normally would have, as well as acquire business from new clients that they had not previously serviced."

In addition to other material misrepresentations made by Shahri, the operative complaint alleged that defendants paid " 'kickbacks' of insurance premiums and/or subsidizing the insurance premiums paid by the large taxi cab fleets"; that they paid "substantial sums of money (a.k.a. bribes) to large taxi cab fleets, disguised as 'Risk Management Incentives,' anniversary gifts or other 'authorized' discounts"; and that they offered loans to large taxi cab fleets at below market interest rates among other allegedly improper payments.

The record shows Bitaraf on behalf of Nova and Shahri on behalf of BB&T separately made presentations to the UITD board during its August 2007 meeting in an attempt to obtain UITD's insurance business for the next policy period. The operative complaint alleged Mercury, in response to a complaint by plaintiffs and others in the "fall of 2007," conducted an internal investigation and concluded its authorized agent Shahri, on behalf of BB&T, had not engaged in any wrongdoing in connection with his August 2007 presentation to the UITD board. As such, plaintiffs alleged they reasonably relied on Mercury's conclusion, as Mercury was in a superior position than plaintiffs to conduct an investigation and plaintiffs "had no reason to disbelieve" Mercury's findings and conclusions as a result of that investigation.

However, the record shows that "[i]n or around January 2011," plaintiffs "further heard through rumor" that defendants had engaged in misconduct during the August 2007

6

UITD board meeting. The operative complaint alleged that plaintiffs sought to conduct discovery to obtain the records of UITD, but that defendants consistently objected to this discovery and that it was not until the "spring of 2012[ ] when Nova learned through formal [*sic*] the eventual production of the audio recordings of UITD's [August 2007] board meetings that contrary to representations made by BB&T, Shahri and [d]efendants . . . during Mercury's investigation, . . . [defendants] had in fact made material misrepresentations and engaged in wrongful conduct and unfair business practices to obtain the [UITD] account. Shahri is recorded in these minutes as stating among other things: [¶] [']. . . In addition to all the services that I offered, sometime ago I received a letter from UITD for celebration of your 30th anniversary, you guys were looking for sponsors, a lot of people talk, I put my money where my mouth is . . . Mercury has a funny way of saying . . . we cannot contribute toward the policy, but nobody in this country can tell me that . . . I cannot contribute money, that is my right . . . The check is already here. A lot of people talk, I walk the talk. What I can put on the table . . . I can put lines of credit . . . and all sorts of banking . . . your credit cards will be cheaper. . . . I have to put a lot of things on the table not just insurance.['] "

## DISCUSSION

### A.  Mercury's "Tenets" Do Not Constitute a "Determinable Legal Standard"

1. *Additional Background*

Before trial and in response to defendants' motion to strike, the trial court ruled that Mercury's tenets could be used as a basis to establish wrongful conduct separate and apart from the interference itself for purposes of an IIPEA cause of action.

The author of the tenets and Mercury's head of agent relations, Richard Wolak, testified at trial that shortly after the August 2007 board meeting he investigated complaints by Bitaraf and others that Shahri had improperly given checks to UITD. Wolak then found Shahri had done nothing wrong.

After UITD voted to purchase automobile liability insurance through BB&T, Mercury again received complaints about Shahri and how defendants had violated Mercury's tenets in connection with Shahri's pitch to the UITD board.  Wolak reopened the investigation.

Wolak testified that he wrote the tenets.  At least with respect to UITD, as noted plaintiffs in large part relied on defendants' violation of the commissions and incentives tenets to show defendants' conduct was independently wrongful.  Wolak testified that, at all times relevant, a "small club of agents and brokers," perhaps about five or six, were in the business of placing commercial transportation insurance in Southern California and that offering commercial transportation insurance was then a new venture for Mercury.

8

Wolak further testified he used the word "tenet," and specifically avoided the word "rule," because "my [i.e., Wolak's] whole purpose here was to create, like, a gentleman's agreement, something like a guideline. Not a strict and hard[-]fast law, but I wanted to give it some meaning. So I used the words that you [*sic*] thought would bring some strength to it and hopefully everyone could adhere to."

He testified that if the tenets were violated, Mercury "didn't promote any remedy" and instead, "would take under advisement whatever the violation would be"; that the tenets were not binding but rather were "just suggestions"; that he "absolutely" did not intend the tenets to have "any legal effect," or to use them to set up some sort of "legal structure"; that he never used the tenets to take any disciplinary action against a "single person"; that the purpose of the tenets was "to keep the Mercury agents from fighting with each other while [Mercury] tried to get [its commercial transportation insurance] business off the ground"; and that he unilaterally withdrew the tenets in March 2008.

As noted, Wolak further investigated whether any of the tenets were violated by Shahri in connection with the August 2007 board meeting after Wolak received new complaints in October 2007. Wolak again determined there was no such violation, a conclusion he reiterated at trial. In fact, at trial Wolak testified that, when Shahri offered through BB&T (which was owned by a bank) to provide UITD various additional services, including cheaper credit cards and lines of credit, Shahri was merely engaging in healthy competition where one independent agent/broker was seeking to "get a competitive advantage over another Mercury agent[/broker]."

9

Specifically, Wolak testified Shahri was not "rebating money. He's creating a better price as far as the insurance product is concerned. This is something in the banking business, whatever other things that a brokerage has to offer. That is what they're offering. This has nothing to do with the -- playing with the rates and commissions to overcome the competition."

When asked if offering such services violated the incentives tenet, Wolak testified, "Again, going back to this: This is a guideline. Gifts mean[] tickets to the Super Bowl, not things that they can do in terms of what brokers do: adding products and services to a client's repertoire to help them better cover their business."

With respect to the anniversary "gift," Wolak testified when he initially investigated the matter some numbers regarding the amount of the "gift" were "bantered about," but he then did not have specific knowledge about what Shahri had offered the UITD board. Nonetheless, he found nothing wrong with making such a "gift," noting: "Again, the guidelines were for the surreptitious payment, meaning that -- we're going to sneak this money to you under the table or however they're going to do it -- give you a rebate, and that's how we're going to get money back to you because I can't do it any other way. But it's common for contributions to be made to a fund -- anniversary fund that paid for their -- they can solicit that from any broker. They can solicit the taxicab people and say, Hey, all you four brokers in the business, would you like to contribute to our anniversary fund?"

With respect to the 30th anniversary "gift," the record shows BB&T conducted an internal audit and learned in May or June 2007 that UITD initially was owed about $161,000 in refunds on prior UITD polices placed by BB&T and issued by one or more liability insurers that had gone into liquidation. Shahri testified that in mid-July 2007, before the UITD board meeting, he delivered a refund check in this amount to the president of UITD, as also reflected by an accompanying cover letter drafted by Shahri explaining the audit and how the majority of the refund was due to the insolvency of Insurance Co. of New York. The letter stated the return of such funds was "perfect timing for your 30th anniversary celebration."

The record shows a further audit by BB&T uncovered an additional $13,000 and change in refund owing as returned premium. Shahri again met with, and delivered a check in this amount to, the president of UITD before Shahri's August 2007 presentation. According to Shahri, the president of UITD stated during these meetings that a portion of the money refunded by BB&T would be used to cover the costs of a party celebrating UITD's anniversary and to purchase and install cameras in certain vehicles, which would result in lower premiums.

The record also shows both before and during his August 2007 presentation to the board, Shahri told UITD it was entitled to a 5 percent renewal discount from Mercury, a statement which turned out to be incorrect. As discussed in more detail *post*, plaintiffs rely on this statement among others to show Shahri made material misrepresentations

11

during his August 2007 presentation in order to gain an unfair competitive advantage over plaintiffs.

In any event, the record shows UITD was not entitled to a 5 percent renewal discount because UITD was going into its third year with Mercury, whereas the renewal discount only applied *after* three years for renewing customers like UITD. Shahri testified he misread a Mercury worksheet when he offered the 5 percent renewal discount, which Wolak agreed was an "easy" mistake to make because the renewal discount actually began in year four of the renewal, although the Mercury worksheet suggested the discount was available in year "3." The record shows BB&T subsequently made up the difference in the down payment of the policy and covered the loss by submitting a claim on its separate errors and omissions policy.

After receipt of the checks, the record shows there is a conflict in the evidence regarding whether the UITD board conducted its own investigation regarding the propriety of the checks, inasmuch as Bitaraf had subsequently complained to the UITD board during a second presentation held on September 4, 2007 that the checks from BB&T were "going to be a problem." The testimony shows the money initially was placed in a trust account. One board member testified UITD did not conduct any form of investigation regarding the two checks, including determining whether the checks were a premium refund or a gift. Instead, according to this board member, UITD just blindly accepted the checks, although this member did recall a company attorney met with the board regarding the checks.

12

However, another board member in attendance at the August and September 2007 presentations by Shahri testified the board consulted its corporate attorney, who concluded there was no problem with the two checks because, after investigation, it was determined they were merely "premium refund[s]," and, thus, it was "[UITD's] money."

2. *Guiding Principles*

The elements of an IIPEA claim are: " ' " '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.' [Citations.]" [Citation.]' " (*Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 596.)

Particularly relevant to the case at issue, the interference *also* must amount to "independently actionable conduct." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159 (*Korea Supply*).) For an act to be sufficiently independently wrongful, it must be "unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other *determinable legal standard*." (*Ibid.*, fn. omitted & italics added.) Accordingly, the alleged interference must have been "wrongful by some legal measure other than the fact of interference itself." (*Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393.)

13

"The independently wrongful act [for purposes of IIPEA] must be the act of interference itself, but such act must *itself* be independently wrongful. That is, '[a] plaintiff need not allege the interference and a second act independent of the interference. Instead, a plaintiff must plead and prove that the conduct alleged to constitute the interference was independently wrongful, i.e., unlawful for reasons other than that it interfered with a prospective economic advantage. [Citations.]' (*Stevenson Real Estate Services, Inc. v. CB Richard Ellis Real Estate Services, Inc.* (2006) 138 Cal.App.4th 1215, 1224 [(*Stevenson*)].)

"It is the plaintiff's burden to plead and prove that the defendant's conduct is independently wrongful in order to recover. The fact that the defendant's conduct was independently wrongful is an element of the cause of action itself. (*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 881.)

"The question has arisen as to whether, in order to be actionable as interference with prospective economic advantage, the interfering act must be independently wrongful *as to the plaintiff*. It need not be. There is 'no sound reason for requiring that a defendant's wrongful actions must be directed towards the plaintiff seeking to recover for this tort. The interfering party is liable to the interfered-with party [even] "when the independently tortious means the interfering party uses are independently tortious *only as to a third party*." ' (*Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, 29 Cal.4th at p.

14

1163.)" (*Crown Imports, LLC v. Superior Court* (2014) 223 Cal.App.4th 1395, 1404-1405, fn. omitted.)

The *Stevenson* case informs our analysis on this issue. There, the plaintiff sued the defendants for IIPEA after the plaintiff " 'expended hundreds of hours of time' " identifying rental properties at the request of a third party. (*Stevenson*, *supra*, 138 Cal.App.4th at p. 1218.) Ultimately, the plaintiff located a suitable property for the third party and provided the third party with "substantial information" regarding that particular property. (*Ibid.*) After the plaintiff commenced negotiations for the lease of the property, the third party demanded defendant Insignia negotiate the lease on its behalf. Plaintiff in response informed Insignia that its conduct violated the Rules of Professional Conduct of the American Industrial Real Estate Association (Association), which applied to the property because it was listed for lease with Association member defendant CB Richard Ellis, the successor-in-interest to Insignia. (*Id.* at pp. 1218-1219.) Eventually, the third party leased the property for 66 months, and Insignia, rather than the plaintiff, received a 3 percent commission. (*Id.* at p. 1219.)

A key issue in *Stevenson* was whether "a trade association's written rules are sufficient to constitute a 'determinable legal standard,' as required by *Korea Supply*, *supra*, 29 Cal.4th at page 1159." (*Stevenson*, *supra*, 138 Cal.App.4th at p. 1222.) In analyzing this issue, the *Stevenson* court noted as follows: "No California case has addressed this issue. Several states that require or permit a showing of wrongful conduct for intentional interference with prospective economic advantage permit a cause of action

15

based upon a violation of established industry, trade or professional rules or standards."
(*Ibid.*, fn. omitted.)

Although the *Stevenson* court recognized that reliance on "industry, trade or professional rules or standards" to support an interference claim was "not without criticism" (*Stevenson, supra*, 138 Cal.App.4th at p. 1223), it nonetheless concluded that "a violation of well-defined, established rules or standards of a trade, association or profession may constitute the type of wrongful conduct that will support a cause of action for intentional interference with prospective economic advantage. The conclusion is based primarily upon the language used in *Korea Supply.* The California Supreme Court held an act was 'independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' (*Korea Supply, supra*, 29 Cal.4th at p. 1159, fn. omitted.) The specified sources—constitution, statute, regulation and common law—account for virtually all sources of legal restrictions imposed upon a party's conduct. 'Other determinable legal standard' necessarily refers to some other source of limitations upon behavior by which conduct could be assessed. Given the prevailing rule in other states, . . . in an action between competitors, who are bound by well-defined, established rules or standards of a trade, association or profession, those rules may constitute 'a determinable legal standard' within the scope of *Korea Supply.* If particular rules or standards unduly restrict free competition, it may be inappropriate to permit a plaintiff to base an interference with prospective economic advantage upon them.

16

"*Korea Supply* also required, however, that the defendant's conduct amount to 'independently actionable conduct.' (*Korea Supply*, *supra,* 29 Cal.4th at p. 1159.) This necessarily requires that the rules or standards provide for, or give rise to, a sanction or means of enforcement for a violation of the particular rule or standard that allegedly makes the defendant's conduct wrongful. Seldom are the rules or standards of associations, trades and professions likely to give rise to legal causes of action. However, internal remedies available within the association, such as a right of arbitration between the aggrieved members, should suffice to establish 'independently actionable conduct.' " (*Stevenson*, *supra*, 138 Cal.App.4th at pp. 1223-1224.)

In reaching its decision, the court in *Stevenson*, *supra*, 138 Cal.App.4th at page 1222, distinguished this court's opinion in *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249 (*Gemini*), which also informs our decision in this case. In *Gemini*, the plaintiff subcontracted with the defendant to "power coat" aluminum parts in connection with a contract between the plaintiff and a third-party manufacturer. After a dispute arose between the plaintiff and the defendant in connection with the subcontract, a principal of the defendant instructed one of his salespersons to " 'go get the [third party's] business.' " (*Id.* at p. 1254.) The plaintiff sued the defendant for IIPEA among other causes of action after the defendant was successful in providing the third party the same services/materials previously provided by the plaintiff.

In affirming the judgment in favor of the defendant, this court in *Gemini* concluded opinion testimony proffered by the plaintiff to the effect that that it would be

17

" 'unethical,' 'really bad business' or not 'customary in the industry' " for the defendant "to solicit the account of a company with which [the plaintiff] was [then] doing business" was insufficient to establish independently wrongful conduct for purposes of IIPEA. (*Gemini*, *supra*, 95 Cal.App.4th at pp. 1257-1258.) In so concluding, this court noted that relying on opinions applying a "nebulous 'industry standards' test . . . would create uncertainty and chill, not maximize, competition." (*Id.* at p. 1258.)

As noted, *Stevenson* distinguished *Gemini* from its facts, concluding: "Unlike the opinion testimony relied upon by the plaintiff in *Gemini*, the Association's Rules are written and presumably made available to all Association members. The Rules therefore cannot be deemed nebulous. Any Association member and anyone with access to the Rules could easily refer to the written rules to discover what the Rules permitted, required and prohibited. The Rules therefore do not implicate the concerns regarding uncertainty and chilling competition expressed by the court in *Gemini*." (*Stevenson*, *supra*, 138 Cal.App.4th at p. 1222.)

3. *Analysis*

We independently conclude Mercury's tenets do not constitute a "determinable legal standard" as required by our Supreme Court. (See *Korea Supply*, *supra*, 29 Cal.4th at p. 1159.) Indeed, as noted by their author Wolak, the tenets were not intended to be "rules" but rather a "gentlemen's agreement" between Mercury and its independent agents/brokers; they applied only to a handful of agents/brokers then placing commercial transportation insurance with Mercury, which was seeking to enter the commercial

18

transportation market; they were enforced rarely if ever by Mercury; and they were ambiguous regarding what Mercury permitted, required, and prohibited, including with respect to incentives and/or refunds, as aptly demonstrated by Wolak's testimony in this case.

As such, we conclude the tenets were not "*well-defined*, established rules or standards" on which to base an IIPEA claim (see *Stevenson*, *supra*, 138 Cal.App.4th at p. 1223, italics added) but rather were "nebulous" guidelines that "would create uncertainty" (see *Gemini*, *supra*, 95 Cal.App.4th at p. 1259).

However, even *if* the tenets constituted a "determinable legal standard" for purposes of an IIPEA cause of action, we conclude they nonetheless unduly restricted free competition. (See *Stevenson*, *supra*, 138 Cal.App.4th at p. 1223; see also *Gemini*, *supra*, 95 Cal.App.4th at p. 1258.) Indeed, our own independent research suggests it is not unlawful for an agent/broker to obtain a competitive advantage by offering incentives, including reducing his or her commission or offering rebates, when placing insurance.[2] Although *former* Insurance Code section 751[3] prohibited "unlawful rebates"

---

[2]    We note Insurance Code section 750 prohibits offering any "rebate, refund, commission, or other consideration . . . as compensation or inducement" in connection with the "processing, presenting, or negotiating *claims*, including *claims* under policies of insurance." (Italics added.) This statute has no application to the case at bar, which does not involve an insurance *claim.*

[3]    Insurance Code former section 751 provided: "An insurer, or an insurance agent, broker, or solicitor, personally or otherwise, shall not offer or pay, directly or indirectly, as an inducement to enter into an insurance contract, any valuable consideration which is not clearly specified, promised or provided for in the policy, or application for the insurance, and any such consideration not appearing in the policy is an unlawful rebate."

19

in connection with the procurement of insurance, this anti-rebating statute was repealed in 1988 by the passage of Proposition 103.  (Repealed by Initiative Measure (Prop. 103, approved Nov. 8, 1988, § 7).)

As such, it appears Mercury's incentives tenet, which as noted prohibited "incentivizing arrangements outside of the premium quote to attract . . . business," was an invalid restraint on competition.  (See Antitrust Guidelines for the Insurance Industry (Cal. Dept. of Justice, 1990) at p. 59 (Antitrust Guidelines) [noting the "repeal of the anti-rebating statute necessarily affects the antitrust context by giving legal recognition to the entrepreneurial freedom of agents to compete by reducing their commissions" and further noting "coercive arrangements [by insurers] to prohibit agents from granting or advertising rebates are unlawful"].)

We reach the same conclusion with respect to the commissions tenet.  As noted, that tenet provided:  "The company [Mercury] will not allow the agent/broker a competitive advantage over another Mercury producer by relinquishing commission for a reduced rate over another Mercury quote."  Again, after repeal of the anti-rebating statute in 1988, an agent/broker may properly exercise his or her "entrepreneurial freedom" and compete for business by "relinquishing" commission in order to offset premiums.  (See Antitrust Guidelines, at p. 59.)

In sum, we independently conclude Mercury's tenets cannot be used as a "determinable legal standard" for purposes of plaintiffs' IIPEA claim.  The tenets were not rules, much less "well-defined" rules (see *Stevenson*, *supra*, 138 Cal.App.4th at p.

20

1223), but were rather merely guidelines that were intended by their drafter to be a "gentlemen's agreement" between Mercury and a few independent agents/brokers to discourage infighting when competing for business.

However, even *if* such tenets constituted a "determinable legal standard," we further conclude it would be "inappropriate to permit a plaintiff to base an interference with prospective economic advantage upon them" (see *Stevenson*, *supra*, 138 Cal.App.4th at p. 1223) because, at a minimum, they unduly restricted lawful competition among agents/brokers when placing insurance. (See Antitrust Guidelines, at p. 59.)

B. Other Bases to Establish a "Determinable Legal Standard"

1. *The UCL Claim*

Plaintiffs contend that even if Mercury's tenets do not constitute a "determinable legal standard" for purposes of their IIPEA cause of action, they nonetheless established this element of the tort based on the jury's finding that defendants committed an "unfair, fraudulent or unlawful business practice in regard to either the [UITD] or the [SGT] accounts."

a. Additional Background

The record shows that with respect to plaintiffs' UCL claim, the jury was instructed as follows:

"Question No. 1: Did Defendants commit an unfair, fraudulent or unlawful business practice in regard to either the [UITD] or the [SGT] accounts?"

21

Because the jury answered this question "yes," they were instructed to go to Question No. 2, which asked:

"Question No. 2: Did Defendants give rebates, give up commissions, provide unearned discounts or credits to either [UITD] or [SGT] that were not given to other taxi cab companies purchasing insurance on like terms and conditions?"

Because the record shows the jury again answered this question "yes," they were instructed to go to Question No. 3, which asked:

"Question No. 3: Did the payment of money, allowance for unearned credits or discounts, or giving up of commissions have a tendency to destroy competition?"

Because the jury also answered "yes" to this question, it was instructed to answer Question No. 4, which provided:

"Question No. 4: Was Defendants' conduct a substantial factor in causing Plaintiffs' harm?"

The jury again answered this question "yes" but found plaintiffs' "out-of-pocket expenses . . . as a result of the unfair, fraudulent, or unlawful business practice" by defendants was "$0.00." The record also shows the jury was given other instructions regarding plaintiffs' UCL claim, including defining "business act or practice," "unfair," "fraudulent," and "unlawful" among others.

b. Guiding Principles and Analysis

The UCL defines " 'unfair competition' as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.' " (*Zhang*

22

*v. Superior Court* (2013) 57 Cal.4th 364, 370.)  A UCL action " 'is not an all-purpose substitute for a tort or contract action.' [Citation.]  Instead, the [A]ct provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices. . . .  [T]he 'overarching legislative concern [was] to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition.' " (*Korea Supply*, *supra*, 29 Cal.4th at p. 1150.)  As a result, the remedies available to private individuals for violation of the UCL are limited to restitution and injunctive relief. (*Id.* at p. 1144.)  Because the statute " 'is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.' "  (*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).)

A business act or practice is "unfair" under the UCL when the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  (*Cel–Tech*, *supra*, 20 Cal.4th at p. 187, fn. omitted.)  A business act or practice is "unlawful" when it violates a predicate law.  (*Id.* at p. 180; see also *CADC/RAD Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 793 [noting the "standards applicable to a UCL unfairness claim are something of a moving target"].)

"Finally, a fraudulent business act or practice is one in which members of the public are likely to be deceived. [Citation.] Thus, in order to state a cause of action based on a fraudulent business act or practice, the plaintiff must allege that consumers are likely to be deceived by the defendant's conduct. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211.)" (*Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1134 (*Prakashpalan*).)

Here, the special verdict required the jury in Question Nos. 2 and 3 to determine whether defendants engaged in conduct that had a "tendency to destroy competition" as a result of defendants' giving "rebates" or giving up "commissions . . . or other credits" to UITD or SGT. Although the jury answered both questions "yes," as noted *ante* we independently conclude that after repeal of Insurance Code former section 751 in 1988, defendants' conduct as so described in Question Nos. 2 and 3 was not unlawful and, thus, cannot be used as a basis to show unfair competition. (See Antitrust Guidelines, at p. 59.)

That is, offering rebates or giving up commissions is not "unfair" within the meaning of the UCL because such conduct does *not* "threaten[] an incipient violation of an antitrust law, or violate[] the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threaten[] or harm[] competition." (See *Cel–Tech*, *supra*, 20 Cal.4th at p. 187.) Rather, as noted, such conduct actually encourages lawful competition.

Such conduct, again as specifically described in Question Nos. 2 and 3, is also not "unlawful" within the meaning of the UCL because it does not result in the "violation of

another law" that can be used as a predicate under this prong. (See *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718; see also Antitrust Guidelines, at p. 59.) Nor is such conduct "fraudulent"; not only is there no evidence in the record to support the finding that the public was likely to be deceived by defendants offering UITD, SGT or both, a rebate of commissions but, as was the case with respect to the "unfair" and "unlawful" prongs of the UCL, such conduct (as specifically described in the special verdict form) is not unlawful or deceitful. (See *Prakashpalan*, *supra*, 223 Cal.App.4th at p. 1134.)

In sum, we independently conclude that the conduct defined in Question Nos. 2 and 3 of the special verdict cannot be the basis for a finding of an "unfair," "unlawful" *or* "fraudulent" act or practice under the UCL, as such conduct as a matter of law is not "unlawful competition." As such, we further conclude this conduct cannot be the basis to establish a "determinable legal standard" for the tort of IIPEA.

Plaintiffs nonetheless contend that defendants' conduct of "[d]efrauding insurance companies out of premiums, placing cabs in wrong zip codes and selling phony insurance coverages" established the "unlawful" prong for purposes of the UCL because such conduct separately violates various provisions of the Insurance Code. But, as noted *ante*, the jury was specifically instructed with respect to the conduct that was deemed actionable under the UCL claim, which did *not* include any alleged Insurance Code violation.

25

In any event, we note from the record that plaintiffs did *not* allege in their operative complaint, or argue in their opposition to defendants' motion to strike portions of that complaint, that defendants' conduct violated Insurance Code sections 780,[4] 781[5] and/or 790.03, subdivision (a)[6] in order to show such conduct was "unlawful" under the

---

[4] Insurance Code section 780 provides: "An insurer or officer or agent thereof, or an insurance broker or solicitor shall not cause or permit to be issued, circulated or used, any statement that is known, or should have been known, to be a misrepresentation of the following: [¶] (a) The terms of a policy issued by the insurer or sought to be negotiated by the person making or permitting the misrepresentation. [¶] (b) The benefits or privileges promised thereunder. [¶] (c) The future dividends payable thereunder."

[5] Section 781 of the Insurance Code provides: "(a) A person shall not make any statement that is known, or should have been known, to be a misrepresentation (1) to any other person for the purpose of inducing, or tending to induce, such other person either to take out a policy of insurance, or to refuse to accept a policy issued upon an application therefor and instead take out any policy in another insurer, or (2) to a policyholder in any insurer for the purpose of inducing or tending to induce him or her to lapse, forfeit or surrender his or her insurance therein. [¶] (b) A person shall not make any representation or comparison of insurers or policies to an insured which is misleading, for the purpose of inducing or tending to induce him or her to lapse, forfeit, change or surrender his or her insurance, whether on a temporary or permanent plan."

[6] Insurance Code section 790.03 defines "unfair methods of competition and unfair and deceptive acts or practices" to include: "(a) Making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular, or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby or the dividends or share of the surplus to be received thereon, or making any false or misleading statement as to the dividends or share of surplus previously paid on similar policies, or making any misleading representation or any misrepresentation as to the financial condition of any insurer, or as to the legal reserve system upon which any life insurer operates, or using any name or title of any policy or class of policies misrepresenting the true nature thereof, or making any misrepresentation to any policyholder insured in any company for the purpose of inducing or tending to induce the policyholder to lapse, forfeit, or surrender his or her insurance."

UCL.[7] " '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.' Thus, 'we ignore arguments, authority, and facts not presented and litigated in the trial court. Generally, issues raised for the first time on appeal which were not litigated in the trial court are waived.' " (*Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11, fns. omitted.)

And, assuming without deciding defendants' conduct of "[d]efrauding insurance companies out of premiums, placing cabs in wrong zip codes and selling phony insurance coverages" violated Insurance Code sections 780, 781 and/or 790.03, subdivision (a), as plaintiffs now claim, we nonetheless conclude such violations do not establish as a matter of law unfair competition for purposes of the UCL. "[N]either the Insurance Code nor regulations adopted under its authority provide a private right of action." (*Rattan v. United Servs. Auto. Ass'n* (2000) 84 Cal.App.4th 715, 724.) As such, in order to state a claim under the UCL based on an agent/broker's conduct, a plaintiff must allege something more than a mere violation of the Insurance Code. (See *Raisin Bargaining Ass'n v. Hartford Cas. Ins. Co.* (E.D. Cal. 2010) 715 F.Supp.2d 1079, 1091; see also *Maler v. Superior Court* (1990) 220 Cal.App.3d 1592, 1598 [noting a plaintiff cannot circumvent the ban on a private action for damages under Insurance Code section 790.03

---

7    We note that in connection with the UCL claim, the special verdict also did not require the jury to specify which of the "three varieties" of unfair competition defendants' conduct violated (see *Cel–Tech*, *supra*, 20 Cal.4th at p. 180), as the special verdict merely asked whether defendants committed "an unfair, fraudulent *or* unlawful business practice." (Italics added.)

"by bootstrapping an alleged violation [of that statute] onto [the UCL] so as to state a cause of action [under a different provision of the Insurance Code]"].)  Thus, even assuming defendants violated one or more of these (or other) provisions of the Insurance Code, we conclude such violations do not establish as a matter of law unlawfulness under the UCL.

2. *Intentional Misrepresentation*

Although plaintiffs' operative complaint did *not* assert a cause of action for intentional misrepresentation, we note from the record the jury was instructed with respect to this common law tort ostensibly because it too potentially could serve as a basis to establish a "determinable legal standard" for plaintiffs' IIPEA claim.  (See *Korea Supply*, *supra*, 29 Cal.4th at p. 1159 [noting an "act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, *common law*, or other determinable legal standard" (italics added & fn. omitted)].)

With respect to "intentional misrepresentation," the jury was instructed as follows:

"1. That Defendants represented to Mercury, to [UITD] or to [SGT] that a fact was true; [¶] 2. That Defendants' representation was false; [¶] 3. That Defendants knew that the representation was false when it was made, or that the representation was made recklessly and without regard for its truth; [¶] 4. That Defendants intended that Mercury, UITD or [SGT] rely on the representation; [¶] 5. That Mercury, UITD or [SGT] reasonably relied on Defendants' representation; [¶] 6. That Plaintiffs were harmed; and

28

[¶] 7. That Mercury's, UITD's or [SGT's] reliance on Defendants' representation was a substantial factor in causing Plaintiffs' harm."

The jury was also instructed as follows on the meaning of "reliance":

"Mercury, [UITD] or [SGT] relied on Defendants' misrepresentation if the misrepresentation substantially influenced Mercury, UITD or [SGT] to take action in a certain manner.

"With respect to UITD, UITD would likely have renewed its policy with Plaintiffs had Defendants not made misrepresentations of returned premiums as a gift for UITD's 30th anniversary, or had not misrepresented that UITD was entitled to a 5% credit and paid 5% of UITD's premium in violation of Mercury's written guidelines.

"Or

"With respect to [SGT], Mercury would not have offered the policy for the amount of premium quoted to Defendants without Defendants' misrepresentation regarding the location of [SGT's] taxi cab units.

"Or

"UITD would likely have renewed its policy through Plaintiffs without the misrepresentations of Defendants.

"Or

"[SGT] would likely have renewed its policy through Plaintiffs without the misrepresentations by Defendants regarding the lower premium based on the incorrect garaging locations or areas of operation of [SGT's] taxi cabs, or Defendants'

29

misrepresentations regarding the policy's $1 million in uninsured motorist (UM) coverage, or that [SGT] did not have to pay premiums for its spare taxis.

"It is not necessary for Defendants' misrepresentations to be the only reason for the conduct by Mercury, SGT or UITD."

Finally, the jury was instructed as follows on the meaning of "reasonable reliance":

"In determining whether UITD's, Mercury's, or [SGT's] reliance on the misrepresentation was reasonable, Plaintiffs must first prove that the matter was material. A matter is material if a reasonable person would find it important in determining his or her choice of action.

"If you decide that the matter is material, you must then decide whether it was reasonable for UITD, Mercury, or [SGT] to rely on this representation. In making this decision, take into consideration UITD's, Mercury's, or [SGT's] intelligence, knowledge, education, and experience.

"However, it is not reasonable for anyone to rely on a misrepresentation that is preposterous. It also is not reasonable for anyone to rely on a misrepresentation if facts that are within UITD's, Mercury's, or [SGT's] observation show that it is obviously false."

Here, plaintiffs contend there is substantial evidence showing Shahri on behalf of BB&T made myriad false representations.[8] However, assuming some or all of such

_____

8    Such misrepresentations included among others Shahri's statement during the August 2007 UITD board meeting that the returned premiums already given to UITD were a "gift" for UITD's 30th anniversary; his statement both before and during that same meeting that UITD was entitled to a 5 percent renewal credit when in fact UITD was not

30

representations were false and assuming plaintiffs can rely on the representations of defendants to *others* to establish an intentional misrepresentation cause of action,[9] we conclude under the circumstances of this case that such misrepresentations do not constitute a "determinable legal standard" for purposes of plaintiffs' IIPEA claim.

Indeed, as the jury instructions illustrate, to state a valid cause of action for intentional misrepresentation plaintiffs were required to prove, and the jury to find, several elements other than whether defendants' various representations to UITD, SGT and/or Mercury were false. We note plaintiffs have *not* argued in their brief that there is substantial evidence in the record to support findings with respect to these additional elements, including that UITD, SGT and/or Mercury *relied* on such misrepresentations and/or whether their reliance was *reasonable*. We further note there is no finding by the

entitled to such a credit; his statement that SGT's taxi cab units were operated and/or garaged in certain locations, when in fact those units were actually operated and/or garaged in a different location that subsequently required an upward adjustment of SGT's premiums; and his statement that SGT was not required to pay a premium on 75 of its "spare" cabs, which were operated when a "regular" cab was out of commission, which turned out not to be correct.

9       We note the jury was instructed it could find intentional misrepresentation based on defendants' conduct directed at UITD, SGT and/or Mercury. We note none of these entities were a party to the lawsuit, and it is not altogether clear that plaintiffs had "standing" to assert a misrepresentation claim involving conduct not directed at them. California Civil Jury Instruction (CACI) No. 1900, the standard jury instruction for intentional misrepresentation, teaches that the misrepresentations must have been directed to the plaintiff and that the plaintiff must have relied on such misrepresentations. (See CACI No. 1900, which provides in part that defendant represented to *plaintiff* a fact that was true that turned out to be false; that defendant intended *plaintiff* to rely on the representation and *plaintiff* did so rely; and that *plaintiff's* reliance on the representation was reasonable.) In light of our decision in this case, we decline to reach the standing issue or address any other issues in connection with the intentional misrepresentation jury instructions, including the (confusing) instruction regarding "reliance."

31

jury in the special verdict form that defendants actually committed the tort of intentional misrepresentation.

We therefore conclude on this record that plaintiffs' failure to address this issue on appeal and to provide evidence from the record—which also must be substantial—to establish *all* the elements of intentional misrepresentation, *if* such evidence even exists, results in a forfeiture of the issue on appeal. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.) As such, we further conclude plaintiffs cannot use the tort of intentional misrepresentation to establish the element of "determinable legal standard" for purposes of IIPEA.

C. Plaintiffs Cannot State a Cause of Action for IIPEA or for the Violation of the UCL

We conclude as a matter of law plaintiffs cannot state a cause of action for IIPEA because they did not prove conduct that is independently wrongful separate from the interference itself, which is a required element of this tort. (See *Korea Supply*, *supra*, 29 Cal.4th at p. 1159.) We reach this conclusion because Mercury's commissions and/or incentives tenets do not constitute a "determinable legal standard" for purposes of this tort; because these two tenets, in any event, "unduly restrict[ed] free competition" (see *Stevenson*, *supra*, 138 Cal.App.4th at p. 1223); and because neither plaintiffs' UCL claim nor an intentional misrepresentation cause of action based on defendants' misrepresentations to UITD, SGT and/or Mercury satisfy the independently wrongful standard under the circumstances of this case.

We further conclude plaintiffs cannot state a UCL claim because, as noted, the conduct set forth in Question Nos. 2 and 3 of the special verdict, on which this claim is expressly based, does not constitute "unfair competition" as a matter of law.[10]

## DISPOSITION[11]

The judgment is reversed. The trial court is ordered to enter judgment in favor of defendants. Defendants to recover their costs of appeal.

BENKE, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

---

[10] In any event, we note the jury awarded plaintiffs "$0.00" for out-of-pocket expenses on their UCL claim. We also note that plaintiffs were *not* entitled to an award of damages or punitive damages even *if* successful on this claim. (See *Clark v. Superior Court* (2010) 50 Cal.4th 605, 610 [noting "damages, including punitive damages and increased or enhanced damages" are *not* recoverable for a violation of the UCL].)

[11] In light of our decision, we need not reach defendants' other contentions on appeal.