Filed 5/25/16  Wells Fargo Bank Nat. Assn. v. Rolling Willow LLC CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| WELLS FARGO BANK NATIONAL ASSOCIATION,<br><br>   Plaintiff and Respondent,<br><br>  v.<br><br>ROLLING WILLOW LLC,<br><br>   Defendant and Appellant. | C078520<br><br>(Super. Ct. No. 34201000091328CUCLGDS) |

   "California's antideficiency statutes [citations], enacted during the Depression, limit or prohibit lenders from obtaining personal judgments against borrowers where the lender's sale of real property security produces proceeds insufficient to cover the amount of the debt."  (*Talbott v. Hustwit* (2008) 164 Cal.App.4th 148, 151.)  "These protections cannot be avoided by artifice or waived through a private agreement."  (*CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 783 (*Bradley*).)

1

One of the antideficiency statutes is Code of Civil Procedure[1] section 580d. As relevant here, subdivision (a) of that statute provides, as a general rule, that "no deficiency shall be owed or collected, and no deficiency judgment shall be rendered for a deficiency on a note secured by a deed of trust . . . on real property . . . in any case in which the real property . . . has been sold by the . . . trustee under power of sale contained in the . . . deed of trust." Under subdivision (b), however, the bar in subdivision (a) "does not affect the liability that a guarantor . . . might otherwise have with respect to the deficiency." Thus, "a lender may recover a deficiency judgment from a guarantor who waives his or her antideficiency protections, even though the antideficiency statutes would bar the lender from recovering that same deficiency from the primary borrower." (*Bradley*, *supra*, 235 Cal.App.4th at p. 784.)

"However, to collect a deficiency from a guarantor, he must be a true guarantor and not merely the principal debtor under a different name." (*Cadle Co. II v. Harvey* (2000) 83 Cal.App.4th 927, 932.) "It is well established that where a principal obligor purports to take on additional liability as a guarantor, nothing is added to the primary obligation. [Citations.] The correct inquiry set out by the authority is whether the purported debtor is anything other than an instrumentality used by the individuals who guaranteed the debtor's obligation, and whether such instrumentality actually removed the individuals from their status and obligations as debtors. [Citation.] Put another way, are the supposed guarantors nothing more than the principal obligors under another name? [Citation.] . . . [T]he legislative purpose of the antideficiency law may not be subverted by attempting to separate the primary obligor's interests by making a related entity the debtor while relegating the true principal obligors to the position of guarantors." (*Torrey Pines Bank v. Hoffman* (1991) 231 Cal.App.3d 308, 319-320.)

---

[1] All further section references are to the Code of Civil Procedure.

"Where the borrower and the guarantor are the same, . . . the guaranty is considered an unenforceable sham." (*Bradley*, *supra*, 235 Cal.App.4th at p. 780.)

In this case, the question is whether the purported debtor -- a limited liability company that was formed to serve as a vehicle for the acquisition of a shopping center by another limited liability company in a 1031 exchange[2] -- was nothing more than an instrumentality used by the second limited liability company to acquire the shopping center, such that the second company's guarantee of the note secured by a deed of trust on the shopping center must be treated as a sham. On the record before us, we conclude there is a triable issue of fact on this point. Accordingly, we will reverse the summary judgment entered in favor of the lender on the guaranty.

FACTUAL AND PROCEDURAL BACKGROUND

Before the transactions at issue in this case, James and Ruth Ku,[3] a married couple, jointly owned a limited liability company, defendant Rolling Willow, LLC, which in turn owned and operated two sports and fitness clubs, including real property. While James did, at times, serve as the managing member of Rolling Willow, mostly it was Ruth who filled that role, and in her capacity as managing member Ruth "did the accounting, negotiated contracts and oversaw both clubs."

In or around 2007, tiring from the work load of running two athletic clubs, the Kus began considering selling Rolling Willow's remaining real estate and investing in a shopping center they saw for sale on Fair Oaks Boulevard in Carmichael, known as

---

[2] "Through a 1031 exchange, a taxpayer can defer federal taxes on gains from the sale of a property by using those gains to purchase a second property. (26 U.S.C. § 1031.)" (*Bradley*, *supra*, 235 Cal.App.4th at p. 780.)

[3] To avoid confusion, as necessary we will refer to the Kus individually by their first names.

Carmichael Town Center.[4] During the investigation into the purchase of the shopping center, it came to Ruth's attention that Rolling Willow could save on capital gains taxes from the sale of the athletic club property by entering into a 1031 exchange.

Ruth conducted research regarding 1031 exchanges and ultimately, through Rolling Willow, hired a company that specializes in facilitating such exchanges: Asset Protection Intermediary (API). On November 8, 2007, Rhonda Hall of API forwarded to the Kus and to Lorraine Lew of Alliance Title Company, which was apparently the escrow agent for the purchase of the shopping center, documents necessary for the closing of that purchase. Those documents included a statement of closing conditions dated November 6, 2007, and an exchange accommodation agreement to be signed by Rolling Willow, which API had signed on November 8.

The exchange accommodation agreement -- which bore the subtitle "Transfer of Membership Interest in Disregarded Entity" -- was an agreement between Rolling Willow (as the "Exchanger"), API, as the exchange accommodation titleholder, and a new limited liability company -- Carmichael Town Center LLC -- as the "Disregarded Entity." (Bolding omitted.) The purpose of the agreement was to allow Rolling Willow to engage in what is known as a "reverse" 1031 exchange, in which existing property (referred to as the relinquished property) is exchanged for new property (referred to as the replacement property), but the replacement property is purchased first and the relinquished property is sold later. In such an exchange, "an exchange accommodation titleholder . . . may temporarily hold the [replacement] property and then transfer it to the taxpayer." (*Bradley*, *supra*, 235 Cal.App.4th at p. 780.)

---

**4** To avoid further confusion, we will refer to the shopping center as such (the shopping center), and we will use the name Carmichael Town Center to refer to the limited liability company that was created to take title to the shopping center, as described hereafter.

Under the exchange accommodation agreement, the reverse exchange of property was to be accomplished by API acquiring " 'incidents of ownership' " of the shopping center "by and through its ownership of 100% of the outstanding membership interests . . . in the Disregarded Entity," i.e., the new limited liability company known as Carmichael Town Center. A limited liability company with a single member is referred to as a "disregarded entity" because, for federal income tax purposes, unless it elects to be classified as an association, such a company is "[d]isregarded as an entity separate from its owner." (26 C.F.R. § 301.7701–3(a), (b)(ii) (2012).) Thus, Carmichael Town Center was to acquire title to the shopping center, and by owning Carmichael Town Center, API would be deemed to own the shopping center. Rolling Willow would then have 180 days to sell the athletic club property, at which time API would transfer the ownership of the shopping center to Rolling Willow by transferring to Rolling Willow API's membership interest in Carmichael Town Center. At that time, as the sole member of Carmichael Town Center, Rolling Willow would be deemed the owner of the shopping center, and the 1031 exchange would be complete.

The exchange accommodation agreement contained various terms and conditions reflecting the fact that Carmichael Town Center, at least while it was owned by API, was going to be nothing more than a vehicle for Rolling Willow's acquisition of the shopping center in the 1031 exchange. Those terms and conditions included the following:

1) While an owner's policy of title insurance was to be issued to Carmichael Town Center, Rolling Willow was to advance the premium costs of that insurance.

2) Carmichael Town Center was to be designated an additional named insured on a liability and casualty insurance policy reasonably acceptable to API -- presumably a policy obtained by Rolling Willow.

3) Rolling Willow was to be "solely responsible for all purchase money and transaction expenses incurred by [API] and/or [Carmichael Town Center] in connection with the acquisition of the [shopping center].

5

4) Rolling Willow was to be solely responsible for arranging any third party financing necessary for API and/or Carmichael Town Center to acquire the shopping center.

5) Neither API nor Carmichael Town Center was to have any obligation to advance any sum on behalf of Rolling Willow and could elect to have Rolling Willow advance such sums to any third party that might be due payment in connection with API's acquisition of the shopping center.

6) Any loan obligation of API or Carmichael Town Center was to be nonrecourse as to both of them.

7) Neither API nor Carmichael Town Center was to have any duty to review the loan documents prepared by any third party lender for the benefit of Rolling Willow.

8) During the time that API owned Carmichael Town Center, Rolling Willow was to pay on behalf of API and Carmichael Town Center "all of the costs and expenses relating to acquiring, holding, operating, maintaining, repairing, managing, leasing, improving, constructing or developing the" shopping center.

9) Rolling Willow was to be "solely responsible for paying any encumbrance secured by the" shopping center.

10) Rolling Willow was to be "solely responsible for maintenance of any policies of insurance that m[ight] be required by" API.

11) API and/or Carmichael Town Center could lease the shopping center to Rolling Willow or to a person Rolling Willow designated in writing.

12) API and/or Carmichael Town Center could contract with Rolling Willow, or someone Rolling Willow designated in writing, to manage the shopping center.

13) Except to the extent the shopping center was leased to a third party, as between API, Carmichael Town Center, and Rolling Willow, Rolling Willow was to have the right of possession and the use of the shopping center at Rolling Willow's sole risk and expense.

The closing conditions from API included the following:

"In the event [Carmichael Town Center] is requested to sign any financing documents, this closing is conditioned upon the Note and/or Deed of Trust/Mortgage containing non-recourse language. The following is suggested language for said non-recourse provision:

" 'Lender acknowledges that Borrower will hold title to the Property for purposes of facilitating a tax deferred exchange for Guarantor and that Guarantor is the real party in interest. In making the Loan, Lender has relied solely on the value of the collateral and the financial condition of the Guarantor. . . .' " (Italics omitted.)

Acting on behalf of Rolling Willow, Ruth negotiated to obtain a loan from Placer Sierra Bank, which was later acquired by defendant Wells Fargo Bank (Wells Fargo), to complete the purchase of the shopping center. During those negotiations, Ruth and the representative of the bank, Bob Pedersen, discussed Rolling Willow investing approximately $2 million from the sale of Rolling Willow's athletic club property into the purchase, and that was ultimately made a condition of the loan. According to Ruth, Pedersen "agreed and said the loan was to Rolling Willow," with Carmichael Town Center being "merely a 'straw dog' or 'holding company' for the 1031 exchange."

Ultimately, the purchase of the shopping center closed in December 2007, with a representative of API executing on behalf of Carmichael Town Center a promissory note to Wells Fargo in the sum of $4.1 million. The note included a nonrecourse provision that specified that "there shall be no personal liability on Carmichael Town Center LLC to pay the indebtedness evidenced by this Note or any other instrument evidencing or securing this Note . . . . Lender and subsequent holders of this Note expressly agree to rely solely upon the personal liability of Rolling Willow LLC, Ruth Ku and James Ku and any security or collateral which secures this Note for payment of the Note . . . ." Commercial guaranties of Carmichael Town Center's obligation to Wells Fargo under the note were executed by Ruth, James, and Rolling Willow. Around the same time, Wells

7

Fargo and Carmichael Town Center entered into an interest rate swap transaction related to the loan.

In January 2008, Wells Fargo supplied a form entitled "THIRD PARTY AUTHORIZATION FOR ACH DEBITS AND CREDITS" to be signed by Rolling Willow and Carmichael Town Center. The form authorized Wells Fargo "to initiate debit and credit entries for all obligations and liabilities including interest and fees . . . as they become due on Carmichael Town Center, LLC's Interest Rate Swap Transaction . . . to and from the account in the name of Rolling Willow, LLC . . . ." A similar authorization was signed again in September 2008.

In April 2008, API and Rolling Willow signed a document assigning API's membership interest in Carmichael Town Center to Rolling Willow. The assignment was to be effective upon delivery, but it is not clear when delivery occurred. Ultimately, however, it appears Rolling Willow sold its athletic club real estate around the end of July or beginning of August 2008. The week after that sale -- at which time API presumably delivered the assignment to Rolling Willow, thereby transferring ownership of Carmichael Town Center to Rolling Willow -- Pedersen requested information from Ruth for the Carmichael Town Center loan file, including a current financial statement for Rolling Willow. In connection with that request, Pedersen noted as follows: "We understand that Rolling Willow and Carmichael [Town Center] may be combined together in one operating entity with the sale of the real estate for the Rollingwood Sports Club, so some type of interim [financial statement] that takes this into account may work. Let's discuss."

The record does not show that any such combination of Rolling Willow and Carmichael Town Center ever occurred. In December 2009, Carmichael Town Center defaulted on the loan and the interest rate swap agreement by failing to make the payments due under the note and the agreement. The Kus and Rolling Willow also defaulted on their guaranties.

On November 2, 2010, Wells Fargo filed a verified complaint for monetary damages against Rolling Willow and the Kus (jointly, defendants). Later that month, Wells Fargo acquired title to the shopping center with a credit bid of nearly $2 million at a trustee's sale under the deed of trust that secured the promissory note. Thereafter, in January 2011, Wells Fargo filed a first amended complaint that alleged causes of action for breach of commercial guaranties, money lent, account stated, and unjust enrichment. The amended complaint sought recovery from defendants of a principal sum in excess of $2 million plus a "Swap Termination Fee" of nearly $700,000, with interest on both amounts, plus attorney fees.

In August 2011, defendants filed their answer to the amended complaint. That answer contained four affirmative defenses: failure to state a claim, failure to state a cause of action, negligence of third party, and equitable apportionment.

In early 2013, the parties stipulated that defendants could file an amended answer to the amended complaint. Among other things, the amended answer included a new affirmative defense that defendants called "ILLUSORY CONTRACT." In that defense, defendants alleged that "the Contract between the parties as alleged is an illusory contract in that it seeks to enforce legal obligations on the Guarantors, when the contract explicitly states that the plaintiff's [*sic*] will not seek to enforce the contractual obligation(s) against the contracting party, i.e., CTC . . . . Since the original contract was never intended to be enforced against the original contracting party, . . . then any Guarantee on a non enforceable agreement is Illusory by application of Law."

Based on the parties' stipulation, in March 2013 the court ordered that the amended answer was to be filed forthwith. For some reason, however, it was not -- even though it had been submitted to the court with the stipulation. Nevertheless, as they later stipulated, the parties conducted discovery "as though the . . . Amended answer had been filed" "[a]nd used the language of illusory contract and sham [guaranty] interchangeably in conducting discovery on defendant's [*sic*] defense in this litigation." Ultimately, after

9

the resolution of the summary judgment motion at issue here, the parties stipulated to the filing of the amended answer nunc pro tunc to March 2013.

The case was originally set for trial in March 2013, but Wells Fargo successfully moved for a continuance to allow "additional time to conduct discovery, prepare for trial, and complete dispositive motions." Trial was eventually reset for February 2014, but the week before trial was to begin, the Kus filed for relief in bankruptcy.

With the bankruptcy stay in favor of the Kus in place and the trial date vacated so that Rolling Willow could find a new attorney, in April 2014 Wells Fargo filed a motion for summary judgment or, in the alternative, summary adjudication against Rolling Willow, which was set for hearing in July 2014. In support of its motion, Wells Fargo argued that Rolling Willow had explicitly waived the protections of the antideficiency statutes in its guaranty of the debt owed by Carmichael Town Center.

Rolling Willow opposed Wells Fargo's motion "on the ground that there [we]re triable issues of fact as to what party [wa]s the actual or true obligor under the loan agreement with the bank." In essence, Rolling Willow asserted that its evidence was sufficient to show that Rolling Willow, not Carmichael Town Center, was "the true and intended obligor" and was "therefore entitled to the protections afforded under California's anti-deficiency statutes."

In reply, Wells Fargo argued that Rolling Willow was trying to raise a "sham guaranty" defense to the enforcement of its guaranty and that the court should reject that effort because Rolling Willow did not plead that defense in its answer. Wells Fargo also argued that Rolling Willow had not established that Rolling Willow was the alter ego of Carmichael Town Center or that the guaranty was a sham. In addition, Wells Fargo offered numerous evidentiary objections to the declarations and exhibits Rolling Willow submitted in support of its opposition.

On its own motion, the trial court continued the hearing on the summary judgment motion from July to September.[5] In August, the court struck Rolling Willow's separate statement for noncompliance with various form requirements and also noted that the two declarations Rolling Willow had filed were inadmissible because they were not signed under penalty of perjury. The court gave Rolling Willow leave to file an amended separate statement and amended declarations before the hearing. Rolling Willow did so, and also filed a supplemental declaration, and in response Wells Fargo filed evidentiary objections to one of the amended declarations and to the supplemental declaration.

In its tentative ruling on the motion, the court, looking to Rolling Willow's original answer to the amended complaint instead of its amended answer, held that because Rolling Willow had not pled the sham guaranty defense, the court could not consider the evidence offered by Rolling Willow in opposition to the motion. At the hearing on the motion, Rolling Willow pointed out its amended answer and asserted that the "illusory contract" defense in that answer was essentially the same as the sham guaranty defense on which its opposition to the summary judgment motion was based. The court took the matter under submission and ultimately issued its ruling in December 2014. Disagreeing with Rolling Willow, the court found that Rolling Willow's "affirmative defense of 'illusory contract' does <u>not</u> provide a valid basis for [Rolling Willow] to oppose the present motion based on the 'sham guaranty' defense." Thus, the court held that Wells Fargo's "objections to the totality of [Rolling Willow]'s evidence in opposition (which evidence was offered <u>solely</u> [to] show a 'sham guaranty') were properly sustained and [the] motion was properly granted as effectively unopposed." The court also went on, however, to hold that even if the court considered Rolling Willow's evidence, that evidence did not raise a triable issue of fact on the sham guaranty defense

---

**5** On our own motion, we take judicial notice of the minute order for this continuance, which neither party included in their appendix.

because the evidence failed to show: (1) that there was no legal separation between Rolling Willow and Carmichael Town Center or (2) that Wells Fargo structured the loan in a manner intended to circumvent the antideficiency laws. Accordingly, the trial court granted summary judgment in favor of Wells Fargo and entered judgment against Rolling Willow for $3,073,590.94.

Rolling Willow timely appealed.

DISCUSSION

I

*The Issues Raised By The Pleadings*

On appeal, Rolling Willow first suggests that the trial court erred in concluding that Rolling Willow could not rely on a sham guaranty defense in opposing the summary judgment motion because Rolling Willow did not plead that defense. According to Rolling Willow, Wells Fargo admitted that the parties used the terms "illusory contract" and "sham guaranty" interchangeably in conducting discovery on Rolling Willow's alleged defenses; accordingly, Wells Fargo was not prejudiced by Rolling Willow's inartful pleading.

In response, Wells Fargo contends that "[c]onducting discovery on an issue is not the same as placing the matter at issue in pleadings," and Wells Fargo insists the trial court was correct in concluding that Rolling Willow could not rely on a sham guaranty defense in opposing the summary judgment motion because Rolling Willow did not plead that defense.

" 'The purpose of a summary judgment proceeding is to permit a party to show that material factual claims arising from the pleadings need not be tried because they are not in dispute.' [Citation.] 'The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues . . . .' [Citations.] The complaint measures the materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action. [Citation.] The answer supplements that measure where the plaintiff is the

12

moving party and the defendant relies upon an affirmative defense." (*FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 381-382.)

"To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings. [Citation.] If the opposing party's evidence would show some factual assertion, legal theory, defense or claim not yet pleaded, that party should seek leave to amend the pleadings before the hearing on the summary judgment motion." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264-1265.)

The foregoing rules are nothing more than a specific application, in the summary judgment context, of the axiom that "[t]he pleadings establish the scope of an action and, absent an amendment to the pleadings, parties cannot introduce evidence about issues outside the pleadings." (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1091.) Of course, saying that the pleadings establish the scope of the action and the parties cannot introduce evidence about issues outside the pleadings begs this question (which is central here): What issues can the pleadings in a particular action be said to fairly raise? With respect to the present case, the trial court took a narrow view of the answer to that question, concluding that Rolling Willow's pleading of an "illusory contract" defense was insufficient to allow the introduction of evidence relating to a "sham guaranty" defense because the two defenses are "separate and legally distinct." In the trial court's view, "an illusory contract is an agreement which is rendered unenforceable due to the lack of consideration as a result of one party having an unqualified right to cancel the contract." A sham guaranty, on the other hand, exists "only were it is shown that (1) there is no 'legal separation' between the guarantor and the primary obligor(s) on the underlying loan or (2) the lender structured the loan (and its related guaranty) in a manner intended to circumvent the anti-deficiency laws." Based on this legal distinction between the two defenses, the trial court found that Rolling Willow's pleading of the former did not allow it to oppose summary judgment based on the latter.

13

Whatever merit there may be in the trial court's articulation of the distinction between the two defenses in the abstract, that distinction does not resolve the issue before us because of the application of other pertinent rules the trial court did not mention. One of these is the rule of liberal construction set forth in section 452, which provides that "[i]n the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." Another is the rule that "[t]he court must, in every stage of an action, disregard any error . . . or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the substantial rights of the parties." (§ 475.) In light of these rules, the Second District Court of Appeal observed nearly 100 years ago that "[f]or sufficiency of the facts pleaded, courts look to substance, not to form. The basic principle of the code procedure is that the administration of justice should not be embarrassed by technicalities, strict rules of construction, or useless forms." (*Menefee v. Oxnam* (1919) 42 Cal.App. 81, 96.)

The foregoing authorities suggest that just because "illusory contract" and "sham guaranty" may be legally distinct concepts in the abstract does not mean that distinction is dispositive of the issue here. What matters here is not whether Rolling Willow attached the wrong label to the defense it called "ILLUSORY CONTRACT," or whether Rolling Willow thoroughly and accurately articulated the parameters of the "sham guaranty" defense in its answer, but rather whether Wells Fargo understood what Rolling Willow meant by the defense it pled, and whether Wells Fargo had an ample and fair opportunity to conduct discovery based on its understanding of what Rolling Willow meant. If Wells Fargo had such an understanding and opportunity, then neither substantial justice nor the substantial rights of the parties would be offended by allowing Rolling Willow to oppose Wells Fargo's summary judgment motion based on the defense Wells Fargo understood was at issue.

The dispositive factor here is this: Wells Fargo admitted and agreed that it understood Rolling Willow's "illusory contract" defense was, in effect, a "sham guaranty" defense when the parties stipulated that Rolling Willow's amended answer to the amended complaint should be filed nunc pro tunc back to March 2013, before the summary judgment motion was filed and before the parties finished conducting discovery. Indeed, Wells Fargo specifically agreed that the parties used the terms "interchangeably in conducting discovery on [Rolling Willow]'s alleged defenses in this litigation." Accordingly, we do not see how Wells Fargo could have been surprised by the basis on which Rolling Willow opposed the summary judgment motion or prejudiced in its ability to reply to that response. Absent any such surprise or prejudice, Rolling Willow's "illusory contract" defense must be liberally construed as adequately raising the "sham guaranty" issue, and any defect in Rolling Willow's inartful pleading of the "sham guaranty" defense must be disregarded, so as to achieve substantial justice between the parties and to avoid honoring form over substance. Accordingly, we conclude the trial court erred in determining that the "sham guaranty" issue was not raised by the pleadings.

II

*The Trial Court's Ruling On The Evidence*

As we have noted, Wells Fargo offered numerous evidentiary objections to the declarations and exhibits Rolling Willow submitted in support of its opposition to the motion for summary judgment. In its appellate brief, Wells Fargo contends that (1) the trial court "sustained Wells Fargo's evidentiary objections to the multiple declarations . . . proffered to support Rolling Willow's [o]pposition"; (2) "[t]he trial court judge's review, analysis and rulings on Wells Fargo's evidentiary objections were legally sound, well considered, and wholly reasonable"; (3) "Rolling Willow has not challenged the trial court's ruling on Wells Fargo's evidentiary objections"; and (4) "Rolling Willow's failure to challenge the trial court's evidentiary rulings on appeal requires [this] court to exclude Rolling Willow's evidence."

15

In reply, Rolling Willow contends Wells Fargo has mischaracterized the trial court's ruling. According to Rolling Willow, "[t]he trial court never addressed Wells Fargo's evidentiary objections." Instead, "[t]he trial court determined that Rolling Willow's evidence was inadmissible to defeat Wells Fargo's summary judgment motion *because Rolling Willow had not pled 'sham guaranty' as an affirmative defense*. And the evidence that Rolling Willow offered in opposition to Wells Fargo's motion was relevant only to a "sham guaranty' defense."

We agree with Rolling Willow on this point. It is true that in its tentative ruling, the trial court wrote that Wells Fargo's "objections to [Rolling Willow]'s evidence are sustained." The trial court, however, did not separately analyze or even refer to Wells Fargo's various objections to various portions of the declarations from Rolling Willow. Instead, as Rolling Willow points out, the trial court essentially held that *all* of Rolling Willow's evidence was irrelevant because (in the trial court's view) that evidence addressed an affirmative defense (sham guaranty) that was outside the scope of the pleadings. That *this*, and not any of Wells Fargo's individual evidentiary objections, was the basis of the trial court's ruling on Rolling Willow's evidence was only made more clear by the trial court's submitted matter ruling. There, the trial court first expressly found that the illusory contract defense was not a valid basis for Rolling Willow to oppose the summary judgment motion based on a sham guaranty. Immediately thereafter, the court then stated that "*[f]or this reason*, [Wells Fargo]'s objections to the totality of [Rolling Willow]'s evidence in opposition . . . were properly sustained." (Italics added.) Thus, the trial court excluded Rolling Willow's evidence on the ground it was irrelevant because it pertained to a defense the trial court believed was not alleged in Rolling Willow's answer, not because of any other evidentiary objections Wells Fargo offered.

In light of the foregoing, we are confident the trial court never reached, let alone ruled on, Wells Fargo's individual objections to Rolling Willow's evidence. It is true that

16

in the absence of any such ruling, those objections were still preserved for review on appeal. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) Wells Fargo, however, did not offer any substantive argument with respect to those objections, instead choosing to rest its argument on Rolling Willow's failure to challenge the purported rulings on those objections that the trial court, in fact, never made. In the absence of any pertinent argument from Wells Fargo on its evidentiary objections, we find no basis for excluding any of the evidence Rolling Willow offered in opposition to the summary judgment motion. Accordingly, we proceed to the merits of the sham guaranty defense.

### III

### *The Sham Guaranty Defense*

Rolling Willow contends the evidence it offered in opposition to the summary judgment motion was sufficient to raise a triable issue of fact as to whether Rolling Willow was the true borrower in the transaction and was thus protected by the antideficiency statutes from any liability on its purported guaranty. For the reasons that follow, we agree.

In *Bradley*, the appellate court explained the pertinent rule as follows: "A guaranty is an unenforceable sham where the guarantor is the principal obligor on the debt. This is the case where either (1) the guarantor personally executes the underlying loan agreements or a deed of trust or (2) the guarantor is, in reality, the principal obligor under a different name by operation of trust or corporate law or some other applicable legal principle. The legislative purpose against deficiency judgments may not be subverted by use of a borrowing entity with the true principal obligor relegated to the position of guarantor." (*Bradley*, *supra*, 235 Cal.App.4th at pp. 786-787.) Or, as stated in *Torrey Pines*, "[t]he correct inquiry set out by the authority is whether the purported debtor is anything other than an instrumentality used by the individuals who guaranteed the debtor's obligation, and whether such instrumentality actually removed the

17

individuals from their status and obligations as debtors." (*Torrey Pines Bank v. Hoffman*, *supra*, 231 Cal.App.3d at p. 320.)

In examining the evidence to see if Rolling Willow raised a triable issue of fact as to whether Carmichael Town Center was a mere instrumentality of Rolling Willow for purposes of determining the enforceability of Rolling Willow's guaranty of what purported to be Carmichael Town Center's debt, we are bound by the following rules:

"When a summary judgment motion prima facie justifies a judgment, . . . [c]ounter-affidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue." (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1065.) "There is a triable issue of material fact if . . . the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

Additionally, in ruling on a summary judgment motion, the court must consider all of the evidence, and all inferences reasonably drawn from that evidence, in the light most favorable to the party opposing the motion. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 843.) "All doubts as to whether there are any triable issues of fact are to be resolved in favor of the party opposing summary judgment." (*Zelda, Inc. v. Northland Ins. Co.* (1997) 56 Cal.App.4th 1252, 1259.)

With the foregoing rules in mind, we conclude the evidence was sufficient to raise a triable issue of fact as to whether there was "significant identity" between Rolling Willow and Carmichael Town Center, such that the latter company "should be deemed to be a 'mere instrumentality' [citation] through which [Rolling Willow] operated, but which never served to remove [Rolling Willow] from the status of primary obligor[]." (*Torrey Pines Bank v. Hoffman*, *supra*, 231 Cal.App.3d at p. 321.)

The evidence introduced by Rolling Willow revealed that Carmichael Town Center did not exist until the Kus conceived the idea of exchanging Rolling Willow's

athletic club property for the shopping center after which Ruth ultimately named the new limited liability company.  More importantly, the evidence supports the reasonable conclusion that the sole purpose of creating Carmichael Town Center was so that the new company could serve as a vehicle for Rolling Willow to acquire ownership of the shopping center in a manner allowing Rolling Willow to defer capital gains taxes on the disposition of the athletic club property.

There is no evidence that Carmichael Town Center was capitalized so that it could function as a bona fide company, rather than as merely a shell for completion of the 1031 exchange by Rolling Willow.  Indeed, reasonable inferences from the evidence lead to the conclusion that it was *not* capitalized, because the original owner of the company -- API -- owned the company only for the purpose of facilitating Rolling Willow's 1031 exchange, and there was no reason for API to put any capital into the new company. Moreover, there is no evidence that Rolling Willow provided capital to Carmichael Town Center at the outset, or had any reason to, because the exchange accommodation agreement between API and Carmichael Town Center on the one hand and Rolling Willow on the other essentially provided that Rolling Willow would be directly responsible for all financial obligations that Carmichael Town Center otherwise reasonably could have been expected to pay if Carmichael Town Center had been anything other than a shell.  Specifically, under the agreement, Rolling Willow was responsible for:  (1) the premium costs of a title insurance policy on the shopping center; (2) the cost of maintaining any other policies of insurance API might require; (3) all purchase money and transaction expenses incurred by API and/or Carmichael Town Center in connection with the acquisition of the shopping center; (4) "all of the costs and expenses relating to acquiring, holding, operating, maintaining, repairing, managing, leasing, improving, constructing or developing the" shopping center; and (5) "paying any encumbrance secured by the [shopping center]."

19

In addition to excusing Carmichael Town Center from any financial responsibility in connection with the purchase of the shopping center, the exchange accommodation agreement shifted to Rolling Willow other obligations that Carmichael Town Center reasonably could have been expected to perform if it were a bona fide company seeking to purchase the shopping center and not just a mere shell used to facilitate Rolling Willow's purchase of that asset. Specifically, Rolling Willow was solely responsible for arranging any third party financing necessary for Carmichael Town Center to acquire the shopping center, and Carmichael Town Center had no duty to review the loan documents prepared by any third party lender for the benefit of Rolling Willow.

Also, the exchange accommodation agreement essentially vested the right to operate the shopping center in Rolling Willow, rather than in Carmichael Town Center. Specifically, Carmichael Town Center could only lease the shopping center to Rolling Willow or to a person Rolling Willow designated in writing and could only contract with Rolling Willow or someone Rolling Willow designated in writing to manage the shopping center. And except to the extent the shopping center was leased to a third party, as between API, Carmichael Town Center, and Rolling Willow, Rolling Willow was to have the right of possession and the use of the shopping center at Rolling Willow's sole risk and expense.

Finally, it is worth reiterating that in the conditions API required to close the purchase of the shopping center, API suggested a nonrecourse provision for the promissory note that would have made it clear that Carmichael Town Center would hold title to the shopping center solely for purposes of facilitating the 1031 exchange for Rolling Willow, and Rolling Willow was " 'the real party in interest.' " (Italics omitted.)

Taken together and construed in the light most favorable to Rolling Willow, Rolling Willow's evidence was sufficient to support a finding by a reasonable trier of fact that Carmichael Town Center was nothing more than an instrumentality used by Rolling Willow to complete a 1031 exchange that did not remove Rolling Willow from its status

20

as the true owner of the shopping center and the true borrower under the promissory note to Wells Fargo. If the trier of fact were to make such a finding, then Rolling Willow would be entitled to the protection of section 580d and a judgment against Rolling Willow on its guaranty for the deficiency owed on the shopping center would be prohibited. Accordingly, the trial court erred in granting summary judgment to Wells Fargo.

As a closing note, it is worthwhile to explain how this case differs from *Bradley*, which also involved an asserted sham guaranty arising out of a 1031 exchange. In that case, like this one, a limited liability company (Nohea) was created to serve as a vehicle for a 1031 exchange by another company (No Boundaries), which was a corporation. (*Bradley*, *supra*, 235 Cal.App.4th at pp. 780-782.) The difference in *Bradley* was that No Boundaries, the corporation completing the exchange, did not guarantee Nohea's obligation on the loan used to secure the replacement property. Instead, the guaranties at issue came from the two individual defendants who owned all of the stock in No Boundaries. (*Ibid.*) The individuals "argued the guaranties were shams, and therefore unenforceable, due to their close relationship with" Nohea. (*Id.* at p. 779.) A jury agreed, but the court of appeal did not. (*Id.* at p. 780.) In explaining its decision, the court wrote as follows: "Here, defendants do not have a direct ownership interest in Nohea. The company was originally owned by an [exchange accommodation titleholder] and later transferred to No Boundaries. Moreover, No Boundaries, not defendants, made Nohea's payments under the loan. Defendants contend direct ownership is not required, pointing out that they own No Boundaries with their wives, and that Bradley made the initial down payment on the Napa property. But even if Nohea is merely a shell controlled by No Boundaries and alter ego principles allow for the simultaneous piercing of two corporate veils, defendants still need to establish that we should disregard No Boundaries's corporate form. They have failed to do so. The evidence shows No Boundaries observed the necessary formalities, including passing corporate resolutions,

21

holding corporate meetings, and maintaining separate bank accounts and assets." (*Id.* at p. 789.) Thus, in *Bradley*, the individual defendants could not claim their guaranties were shams because whether Nohea was a mere instrumentality used by No Boundaries to complete the 1031 exchange, it was clear that No Boundaries was not itself a mere instrumentality of its shareholders.

*Bradley* and the present case might be comparable if here *the Kus*, rather than Rolling Willow, were seeking to invalidate their guaranties, but that is not the case. The issue here is whether there was sufficient legal separation between Rolling Willow and Carmichael Town Center to validate Rolling Willow's guaranty of Carmichael Town Center's purported debt. We have found a triable issue of fact on that point. Consequently, reversal is required.

## DISPOSITION

The judgment is reversed. Rolling Willow shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)


/s/_____
Robie, Acting P. J.

We concur:


/s/_____
Mauro, J.


/s/_____
Duarte, J.